*185 Justice Stevens
announced the judgment of the Court and delivered an opinion, in which The Chief Justice and Justice Kennedy join.
At issue in these cases is the constitutionality of an Indiana statute requiring citizens voting in person on election day, or casting a ballot in person at the office of the circuit court clerk prior to election day, to present photo identification issued by the government.
Referred to as either the “Voter ID Law” or “SEA 483,”[1] the statute applies to in-person voting at both primary and general elections. The requirement does not apply to ab *186 sentee ballots submitted by mail, and the statute contains an exception for persons living and voting in a state-licensed facility such as a nursing home. Ind. Code Ann. § 3-11-8-25.1(e) (West Supp. 2007). A voter who is indigent or has a religious objection to being photographed may cast a provisional ballot that will be counted only if she executes an appropriate affidavit before the circuit court clerk within 10 days following the election. §§3-11.7-5-1 (West Supp. 2007), 3-11.7-5-2.5(c) (West 2006).[2], A voter who has photo identification but is unable to present that identification on election day may file a provisional ballot that will be counted if she brings her photo identification to the circuit court clerk’s office within 10 days. §3-11.7-5-2.5(b). No photo identification is required in order to register to vote,[3] and the State offers free photo identification to qualified voters able to establish their residence and identity. §9-24-16-10(b) (West Supp. 2007).[4]
Promptly after the enactment of SEA 483 in 2005, the Indiana Democratic Party and the Marion County Democratic Central Committee (Democrats) filed suit in the Federal District Court for the Southern District of Indiana against the *187 state officials responsible for its enforcement, seeking a judgment declaring the Voter ID Law invalid and enjoining its enforcement. A second suit seeking the same relief was brought on behalf of two elected officials and several nonprofit organizations representing groups of elderly, disabled, poor, and minority voters.[5] The cases were consolidated, and the State of Indiana intervened to defend the validity of the statute.
The complaints in the consolidated cases allege that the new law substantially burdens the right to vote in violation of the Fourteenth Amendment; that it is neither a necessary nor appropriate method of avoiding election fraud; and that it will arbitrarily disfranchise qualified voters who do not possess the required identification and will place an unjustified burden on those who cannot readily obtain such identification. Second Amended Complaint in No. l:05-CV-0634-SEB-VSS (SD Ind.), pp. 6-9.
After discovery, District Judge Barker prepared a comprehensive 70-page opinion explaining her decision to grant defendants’ motion for summary judgment. 458 F. Supp. 2d 775 (SD Ind. 2006). She found that petitioners had “not introduced evidence of a single, individual Indiana resident who will be unable to vote as a result of SEA 483 or who will have his or her right to vote unduly burdened by its requirements.” Id., at 783. She rejected “as utterly incredible and unreliable” an expert’s report that up to 989,000 registered voters in Indiana did not possess either a driver’s license or other acceptable photo identification. Id., at 803. She estimated that as of 2005, when the statute was enacted, *188 around 43,000 Indiana residents lacked a state-issued driver’s license or identification card. Id., at 807.[6]
A divided panel of the Court of Appeals affirmed. 472 F. 3d 949 (CA7 2007). The majority first held that the Democrats had standing to bring a facial challenge to the constitutionality of SEA 483. Next, noting the absence of any plaintiffs who claimed that the law would deter them from voting, the Court of Appeals inferred that “the motivation for the suit is simply that the law may require the Democratic Party and the other organizational plaintiffs to work harder to get every last one of their supporters to the polls.” Id., at 952. It rejected the argument that the law should be judged by the same strict standard applicable to a poll tax because the burden on voters was offset by the benefit of reducing the risk of fraud. The dissenting judge, viewing the justification for the law as “hollow” — more precisely as “a not-too-thinly-veiled attempt to discourage election-day turnout by certain folks believed to skew Democratic”— would have applied a stricter standard, something he described as “close to ‘strict scrutiny light.’” Id., at 954, 956 (opinion of Evans, J.). In his view, the “law imposes an undue burden on a recognizable segment of potential eligible voters” and therefore violates their rights under the First and Fourteenth Amendments to the Constitution. Id., at 956-957.
Four judges voted to grant a petition for rehearing en banc. 484 F. 3d 436, 437 (CA7 2007) (Wood, J., dissenting from denial of rehearing en banc). Because we agreed with their assessment of the importance of these cases, we granted certiorari. 551 U. S. 1192 (2007). We are, however, *189 persuaded that the District Court and the Court of Appeals correctly concluded that the evidence in the record is not sufficient to support a facial attack on the validity of the entire statute, and thus affirm.[7]
I
In Harper v. Virginia Bd. of Elections, 383 U. S. 663 (1966), the Court held that Virginia could not condition the right to vote in a state election on the payment of a poll tax of $1.50. We rejected the dissenters’ argument that the interest in promoting civic responsibility by weeding out those voters who did not care enough about public affairs to pay a small sum for the privilege of voting provided a rational basis for the tax. See id., at 685 (opinion of Harlan, J.). Applying a stricter standard, we concluded that a State “violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard.” Id., at 666 (opinion of the Court). We used the term “invidiously discriminate” to describe conduct prohibited under that standard, noting that we had previously held that while a State may obviously impose “reasonable residence restrictions on the availability of the ballot,” it “may not deny the opportunity to vote to a bona fide resident merely because he is a member of the armed services.” Id., at 666-667 (citing Carrington v. Rash, 380 U. S. 89, 96 (1965)). Although the State’s justification for the tax was rational, it was invidious because it was irrelevant to the voter’s qualifications.
Thus, under the standard applied in Harper, even rational restrictions on the right to vote are invidious if they are unrelated to voter qualifications. In Anderson v. Celebrezze, 460 U. S. 780 (1983), however, we confirmed the general rule that “evenhanded restrictions that protect the *190 integrity and reliability of the electoral process itself” are not invidious and satisfy the standard set forth in Harper. 460 U. S., at 788, n. 9. Rather than applying any “litmus test” that would neatly separate valid from invalid restrictions, we concluded that a court must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the “hard judgment” that our adversary system demands.
In later election cases we have followed Anderson’s balancing approach. Thus, in Norman v. Reed, 502 U. S. 279, 288-289 (1992), after identifying the burden Illinois imposed on a political party’s access to the ballot, we “called for the demonstration of a corresponding interest sufficiently weighty to justify the limitation,” and concluded that the “severe restriction” was not justified by a narrowly drawn state interest of compelling importance. Later, in Burdick v. Takuslni, 504 U. S. 428 (1992), we applied Anderson’s standard for “ ‘reasonable, nondiscriminatory restrictions,’ ” 504 U. S., at 434, and upheld Hawaii’s prohibition on write-in voting despite the fact that it prevented a significant number of “voters from participating in Hawaii elections in a meaningful manner,” id., at 443 (Kennedy, J., dissenting). We reaffirmed Anderson’s requirement that a court evaluating a constitutional challenge to an election regulation weigh the asserted injury to the right to vote against the “‘precise interests put forward by the State as justifications for the burden imposed by its rule.’ ” 504 U. S., at 434 (quoting Anderson, 460 U. S., at 789).[8]
*191 In neither Norman nor Burdick did we identify any litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters. However slight that burden may appear, as Harper demonstrates, it must be justified by relevant and legitimate state interests “sufficiently weighty to justify the limitation.” Norman, 502 U. S., at 288-289. We therefore begin our analysis of the constitutionality of Indiana’s statute by focusing on those interests.
II
The State has identified several state interests that arguably justify the burdens that SEA 488 imposes on voters and potential voters. While petitioners argue that the statute was actually motivated by partisan concerns and dispute both the significance of the State’s interests and the magnitude of any real threat to those interests, they do not question the legitimacy of the interests the State has identified. Each is unquestionably relevant to the State’s interest in protecting the integrity and reliability of the electoral process.
The first is the interest in deterring and detecting voter fraud. The State has a valid interest in participating in a nationwide effort to improve and modernize election procedures that have been criticized as antiquated and inefficient.[9] The State also argues that it has a particular interest in preventing voter fraud in response to a problem that is in part the product of its own maladministration — namely, that Indiana’s voter registration rolls include a large number of names of persons who are either deceased or no longer live in Indiana. Finally, the State relies on its interest in safeguarding voter confidence. Each of these interests merits separate comment.

*192
Election Modernization

Two recently enacted federal statutes have made it necessary for States to reexamine their election procedures. Both contain provisions consistent with a State’s choice to use government-issued photo identification as a relevant source of information concerning a citizen’s eligibility to vote.
In the National Voter Registration Act of 1993 (NVRA), 107 Stat. 77,42 U. S. C. § 1973gg et seq., Congress established procedures that would both increase the number of registered voters and protect the integrity of the electoral process. §1973gg. The statute requires state motor vehicle driver’s license applications to serve as voter registration applications. §1973gg-3. While that requirement has increased the number of registered voters, the statute also contains a provision restricting States’ ability to remove names from the lists of registered voters. § 1973gg~6(a)(3). These protections have been partly responsible for inflated lists of registered voters. For example, evidence credited by Judge Barker estimated that as of 2004 Indiana’s voter rolls were inflated by as much as 41.4%, see 458 F. Supp. 2d, at 793, and data collected by the Election Assistance Committee in 2004 indicated that 19 of 92 Indiana counties had registration totals exceeding 100% of the 2004 voting-age population, Dept. of Justice Complaint in United States v. Indiana, No. l:06-cv-1000-RLY-TAB (SD Ind., June 27, 2006), p. 4, App. 313.
In HAVA, Congress required every State to create and maintain a computerized statewide list of all registered voters. 42 U. S. C. § 15483(a) (2000 ed., Supp. V). HAVA also requires the States to verify voter information contained in a voter registration application and specifies either an “applicant’s driver’s license number” or “the last 4 digits of the applicant’s social security number” as acceptable verifications. § 15483(a)(5)(A)(i). If an individual has neither number, the State is required to assign the applicant a voter identification number. § 15483(a)(5)(A)(ii).
*193 HAVA also imposes new identification requirements for individuals registering to vote for the first time who submit their applications by mail. If the voter is casting his ballot in person, he must present local election officials with written identification, which may be either “a current and valid photo identification” or another form of documentation such as a bank statement or paycheck. § 15483(b)(2)(A). If the voter is voting by mail, he must include a copy of the identification with his ballot. A voter may also include a copy of the documentation with his application or provide his driver’s license number or Social Security number for verification. § 15483(b)(3). Finally, in a provision entitled “Fail-safe voting,” HAVA authorizes the casting of provisional ballots by challenged voters. § 15483(b)(2)(B).
Of course, neither HAVA nor NVRA required Indiana to enact SEA 483, but they do indicate that Congress believes that photo identification is one effective method of establishing a voter’s qualification to vote and that the integrity of elections is enhanced through improved technology. That conclusion is also supported by a report issued shortly after the enactment of SEA 483 by the Commission on Federal Election Reform chaired by former President Jimmy Carter and former Secretary of State James A. Baker III, which is a part of the record in these cases. In the introduction to their discussion of voter identification, they made these pertinent comments:
“A good registration list will ensure that citizens are only registered in one place, but election officials still need to make sure that the person arriving at a polling site is the same one that is named on the registration list. In the old days and in small towns where everyone knows each other, voters did not need to identify themselves. But in the United States, where 40 million people move each year, and in urban areas where some people do not even know the people living in their own
*194 apartment building let alone their precinct, some form of identification is needed.
“There is no evidence of extensive fraud in U. S. elections or of multiple voting, but both occur, and it could affect the outcome of a close election. The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters. Photo [identification cards] currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important.” Building Confidence in U. S. Elections §2.5 (Sept. 2005), App. 136-137 (Carter-Baker Report) (footnote omitted).[10]

Voter Fraud

The only kind of voter fraud that SEA 483 addresses is in-person voter impersonation at polling places. The record contains no evidence of any such fraud actually occurring in Indiana at any time in its history. Moreover, petitioners argue that provisions of the Indiana Criminal Code punish *195 ing such conduct as a felony provide adequate protection against the risk that such conduct will occur in the future. It remains true, however, that flagrant examples of such fraud in other parts of the country have been documented throughout this Nation’s history by respected historians and journalists,[11] that occasional examples have surfaced in recent years,[12] and that Indiana’s own experience with fraudulent voting in the 2003 Democratic primary for East Chicago Mayor[13] — though perpetrated using absentee ballots and not *196 in-person fraud — demonstrate that not only is the risk of voter fraud real but that it could affect the outcome of a close election.
There is no question about the legitimacy or importance of the State’s interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process. While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.
In its brief, the State argues that the inflation of its voter rolls provides further support for its enactment of SEA 483. The record contains a November 5, 2000, newspaper article asserting that as a result of NVRA and “sloppy record-keeping,” Indiana’s lists of registered voters included the names of thousands of persons who had either moved, died, or were not eligible to vote because they had been convicted of felonies.[14] The conclusion that Indiana has an unusually inflated list of registered voters is supported by the entry of a consent decree in litigation brought by the Federal Government alleging violations of NVRA. Consent Decree and Order in United States v. Indiana, No. l:06-cv-1000-RLYTAB (SD Ind., June 27, 2006), App. 299-307. Even though Indiana’s own negligence may have contributed to the serious inflation of its registration lists when SEA 483 was enacted, the fact of inflated voter rolls does provide a neutral *197 and nondiscriminatory reason supporting the State’s decision to require photo identification.

Safeguarding Voter Confidence

Finally, the State contends that it has an interest in protecting public confidence “in the integrity and legitimacy of representative government.” Brief for State Respondents 53. While that interest is closely related to the State’s interest in preventing voter fraud, public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process. As the Carter-Baker Report observed, the “ 'electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters.’” Supra, at 194.
Ill
States employ different methods of identifying eligible voters at the polls. Some merely check off the names of registered voters who identify themselves; others require voters to present registration cards or other documentation before they can vote; some require voters to sign their names so their signatures can be compared with those on file; and in recent years an increasing number of States have relied primarily on photo identification.[15] A photo identification requirement imposes some burdens on voters that other methods of identification do not share. For example, a voter may lose his photo identification, may have his wallet stolen on the way to the polls, or may not resemble the photo in the identification because he recently grew a beard. Burdens of that sort arising from life’s vagaries, however, are neither so serious nor so frequent as to raise any question about the constitutionality of SEA 483; the availability of the right to *198 cast a provisional ballot provides an adequate remedy for problems of that character.
The burdens that are relevant to the issue before us are those imposed on persons who are eligible to vote but do not possess a current photo identification that complies with the requirements of SEA 483.[16] The fact that most voters already possess a valid driver’s license, or some other form of acceptable identification, would not save the statute under our reasoning in Harper, if the State required voters to pay a tax or a fee to obtain a new photo identification. But just as other States provide free voter registration cards, the photo identification cards issued by Indiana’s BMV are also free. For most voters who need them, the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting.[17]
*199 Both evidence in the record and facts of which we may take judicial notice, however, indicate that a somewhat heavier burden may be placed on a limited number of persons. They include elderly persons born out of State, who may have difficulty obtaining a birth certificate;[18] persons who because of economic or other personal limitations may find it difficult either to secure a copy of their birth certificate or to assemble the other required documentation to obtain a state-issued identification; homeless persons; and persons with a religious objection to being photographed. If we assume, as the evidence suggests, that some members of these classes were registered voters when SEA 483 was enacted, the new identification requirement may have imposed a special burden on their right to vote.
The severity of that burden is, of course, mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted. To do so, however, they must travel to the circuit court clerk’s office within 10 days to execute the required affidavit. It is unlikely that such a requirement would pose a constitutional problem unless it is wholly unjustified. And even assuming that the burden may not be justified as to a few voters,[19] that *200 conclusion is by no means sufficient to establish petitioners’ right to the relief they seek in this litigation.
IV
Given the fact that petitioners have advanced a broad attack on the constitutionality of SEA 483, seeking relief that would invalidate the statute in all its applications, they bear a heavy burden of persuasion. Only a few weeks ago we held that the Court of Appeals for the Ninth Circuit had failed to give appropriate weight to the magnitude of that burden when it sustained a preelection, facial attack on a Washington statute regulating that State’s primary election procedures. Washington State Grange v. Washington State Republican Party, 552 U. S. 442 (2008). Our reasoning in that case applies with added force to the arguments advanced by petitioners in these cases.
Petitioners ask this Court, in effect, to perform a unique balancing analysis that looks specifically at a small number of voters who may experience a special burden under the statute and weighs their burdens against the State’s broad interests in protecting election integrity. Petitioners urge us to ask whether the State’s interests justify the burden imposed on voters who cannot afford or obtain a birth certificate and who must make a second trip to the circuit court clerk’s office after voting. But on the basis of the evidence in the record it is not possible to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified.
First, the evidence in the record does not provide us with the number of registered voters without photo identification; Judge Barker found petitioners’ expert’s report to be “utterly incredible and unreliable.” 458 F. Supp. 2d, at 803. Much of the argument about the numbers of such voters comes from extrarecord, postjudgment studies, the accuracy of which has not been tested in the trial court.
*201 Further, the deposition evidence presented in the District Court does not provide any concrete evidence of the burden imposed on voters who currently lack photo identification. The record includes depositions of two case managers at a day shelter for homeless persons and the depositions of members of the plaintiff organizations, none of whom expressed a personal inability to vote under SEA 483. A deposition from a named plaintiff describes the difficulty the elderly woman had in obtaining an identification card, although her testimony indicated that she intended to return to the BMV since she had recently obtained her birth certificate and that she was able to pay the birth certificate fee. App. 94.
Judge Barker’s opinion makes reference to six other elderly named plaintiffs who do not have photo identifications, but several of these individuals have birth certificates or were born in Indiana and have not indicated how difficult it would be for them to obtain a birth certificate. 458 F. Supp. 2d, at 797-799. One elderly named plaintiff stated that she had attempted to obtain a birth certificate from Tennessee, but had not been successful, and another testified that he did not know how to obtain a birth certificate from North Carolina. The elderly in Indiana, however, may have an easier time obtaining a photo identification card than the non-elderly, see n. 17, supra, and although it may not be a completely acceptable alternative, the elderly in Indiana are able to vote absentee without presenting photo identification.
The record says virtually nothing about the difficulties faced by either indigent voters or voters with religious objections to being photographed. While one elderly man stated that he did not have the money to pay for a birth certificate, when asked if he did not have the money or did not wish to spend it, he replied, “both.” App. 211-212. From this limited evidence we do not know the magnitude of the impact SEA 483 will have on indigent voters in Indiana. The record does contain the affidavit of one homeless *202 woman who has a copy of her birth certificate, but was denied a photo identification card because she did not have an address. Id., at 67. But that single affidavit gives no indication of how common the problem is.
In sum, on the basis of the record that has been made in this litigation, we cannot conclude that the statute imposes “excessively burdensome requirements” on any class of voters. See Storer v. Brown, 415 U. S. 724, 738 (1974).[20] A facial challenge must fail where the statute has a “ ‘ “plainly legitimate sweep.”’” Washington State Grange, 552 U. S., at 449 (citing and quoting Washington v. Glucksberg, 521 U. S. 702, 739-740, and n. 7 (1997) (Stevens, J., concurring in judgments)). When we consider only the statute’s broad *203 application to all Indiana voters, we conclude that it “imposes only a limited burden on voters’ rights.” Burdick, 504 U. S., at 439. The “ ‘precise interests’ ” advanced by the State are therefore sufficient to defeat petitioners’ facial challenge to SEA 483. Id., at 434.
Finally we note that petitioners have not demonstrated that the proper remedy — even assuming an unjustified burden on some voters — would be to invalidate the entire statute. When evaluating a neutral, nondiscriminatory regulation of voting procedure, “[w]e must keep in mind that ‘ “[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.”’ Ayotte v. Planned Parenthood of Northern New Eng., 546 U. S. 320, 329 (2006) (quoting Began v. Time, Inc., 468 U. S. 641, 652 (1984) (plurality opinion)).” Washington State Grange, 552 U. S., at 451.
V
In their briefs, petitioners stress the fact that all of the Republicans in the General Assembly voted in favor of SEA 483 and the Democrats were unanimous in opposing it.[21] In her opinion rejecting petitioners’ facial challenge, Judge Barker noted that the litigation was the result of a partisan dispute that had “spilled out of the state house into the courts.” 458 F. Supp. 2d, at 783. It is fair to infer that partisan considerations may have played a significant role in the decision to enact SEA 483. If such considerations had provided the only justification for a photo identification requirement, we may also assume that SEA 483 would suffer the same fate as the poll tax at issue in Harper.
*204 But if a nondiscriminatory law is supported by valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators. The state interests identified as justifications for SEA 483 are both neutral and sufficiently strong to require us to reject petitioners’ facial attack on the statute. The application of the statute to the vast majority of Indiana voters is amply justified by the valid interest in protecting “the integrity and reliability of the electoral process.” Anderson, 460 U. S., at 788, n. 9.
The judgment of the Court of Appeals is affirmed.

It is so ordered.

 Senate Enrolled Act No. 483, 2005 Ind. Acts p. 2005.

 The affidavit must state that (1) the person executing the affidavit is the same individual who cast the provisional ballot on election day; and (2) the affiant is indigent and unable to obtain proof of identification without paying a fee or has a religious objection to being photographed. Ind. Code Ann. § 3-11.7-5-2.5(c). If the election board determines that the challenge to the affiant was based solely on a failure to present photo identification, the “county election board shall . . . find that the voter’s provisional ballot is valid.” §3-11.7-5-2.5(d).

 Voters registering to vote for the first time in Indiana must abide by the requirements of the Help America Vote Act of 2002 (HAVA), 116 Stat. 1666, described infra, at 193.

 Indiana previously imposed a fee on all residents seeking a state-issued photo identification. At the same time that the Indiana Legislature enacted SEA 483, it also directed the Bureau of Motor Vehicles (BMV) to remove all fees for state-issued photo identification for individuals without a driver’s license who are at least 18 years old. See 2005 Ind. Acts ■ p. 2017, §18.

 Specifically, the plaintiffs were William Crawford, Joseph Simpson, Concerned Clergy of Indianapolis, Indianapolis Resource Center for Independent Living, Indiana Coalition on Housing and Homeless Issues, Indianapolis Branch of the National Association for the Advancement of Colored People, and United Senior Action of Indiana. Complaint in No. 49012050 4PL01 6207 (Super. Ct. Marion Cty., Ind., Apr. 28,2005), p. 2.

 She added: “In other words, an estimated 99% of Indiana’s voting age population already possesses the necessary photo identification to vote under the requirements of SEA 483.” 458 F. Supp. 2d, at 807. Given the availability of free photo identification and greater public awareness of the new statutory requirement, presumably that percentage has increased since SEA 483 was enacted and will continue to increase in the future.

 We also agree with the unanimous view of those judges that the Democrats have standing to challenge the validity of SEA 483 and that there is no need to decide whether the other petitioners also have standing.

 Contrary to Justice Scaua’s suggestion, see post, at 204 (opinion concurring in judgment), our approach remains faithfiil to Anderson and Bur-dick. The Burdick opinion was explicit in its endorsement and adherence to Anderson, see 504 U. S., at 434, and repeatedly cited Anderson, see 504 U. S., at 436, n. 5, 440, n. 9, 441. To be sure, Burdick rejected the argument that strict scrutiny applies to all laws imposing a burden on the right to vote; but in its place, the Court applied the “flexible standard” set forth in Anderson. 504 U. S., at 434. Burdick surely did not create a novel “deferential ‘important regulatory interests’ standard.” See post, at 204.

 See National Commission on Federal Election Reform, To Assure Pride and Confidence in the Electoral Process 18 (2002) (with honorary cochairs former Presidents Gerald Ford and Jimmy Carter).

 The historical perceptions of the Carter-Baker Report can largely be confirmed. The average precinct size in the United States has increased in the last century, suggesting that it is less likely that pollworkers will be personally acquainted with voters. For example, at the time Joseph Harris wrote his groundbreaking 1934 report on election administration, Indiana restricted the number of voters in each precinct to 250. Election Administration in the United States 208 (Brookings Institution 1934). An Election Commission report indicates that Indiana’s average number of registered voters per polling place is currently 1,014. Election Assistance Commission, Final Report of the 2004 Election Day Survey, ch. 13 (Sept. 2005) (Table 13) (hereinafter Final Report) (prepared by Election Data Services, Inc.), online at http://www.eac.gov/clearinghouse/clearinghouse/ 2004-eleetion-day-survey (all Internet materials as visited Apr. 16, 2008, and available in Clerk of Court’s case file). In 1930, the major cities that Harris surveyed had an average number of voters per precinct that ranged from 247 to 617. Election Administration in the United States, at 214. While States vary today, most have averages exceeding 1,000, with at least eight States exceeding 2,000 registered voters per polling place. Final Report, ch. 13 (Table 13).

 Infamous examples abound in the New York City elections of the late 19th century, conducted under the influence of the Tammany Hall political machine. “Big Tim” Sullivan, a New York state senator and — briefly—a United States Congressman, insisted that his “repeaters” (individuals paid to vote multiple times) have whiskers:
“ ‘When you’ve voted ’em with their whiskers on you take ’em to a barber and scrape off the chin-fringe. Then you vote ’em again with side lilacs and a moustache. Then to a barber again, off comes the sides and you vote ’em a third time with the moustache. If that ain’t enough and the box can stand a few more ballots clean off the moustache and vote ’em plain face. That makes every one of ’em good for four votes.’ ” M. Werner, Tammany Hall 439 (1928).

 Judge Barker cited record evidence containing examples from California, Washington, Maryland, Wisconsin, Georgia, Illinois, Pennsylvania, Missouri, Miami, and St. Louis. The Brief for Brennan Center for Justice et al. as Amici Curiae in Support of Petitioners addresses each of these examples of fraud. While the brief indicates that the record evidence of in-person fraud was overstated because much of the fraud was actually absentee ballot fraud or voter registration fraud, there remain scattered instances of in-person voter fraud. For example, after a hotly contested gubernatorial election in 2004, Washington conducted an investigation of voter fraud and uncovered 19 “ghost voters.” Borders v. King Cty., No. 05-2-00027-3 (Super. Ct. Chelan Cty., Wash., June 6, 2005) (verbatim report of unpublished oral decision), 4 Election L. J. 418,423 (2005). After a partial investigation of the ghost voting, one voter was confirmed to have committed in-person voting fraud. Le & Nicolosi, Dead Voted in Governor’s Race, Seattle Post-Intelligencer, Jan. 7, 2005, p. Al.

 See Pabey v. Pastrick, 816 N. E. 2d 1138, 1151 (Ind. 2004) (holding that a special election was required because one candidate engaged in “a deliberate series of actions . . . making it impossible to determine the candidate who received the highest number of legal votes cast in the elec *196 tion”). According to the uncontested factual findings of the trial court, one of the candidates paid supporters to stand near polling places and encourage voters — especially those who were poor, infirm, or spoke little English — to vote absentee. The supporters asked the voters to contact them when they received their ballots; the supporters then “assisted” the voter in filling out the ballot.

 Theobald, Bogus Names Jam Indiana’s Voter List, Indianapolis Star, Nov. 5, 2000, App. 145.

 For a survey of state practice, see Brief for State of Texas et al. as Amici Curiae 10-14, and nn. 1-23.

 Ind. Code Ann. § 3-5-2-40.5 (West 2006) requires that the document satisfy the following:
“(1) The document shows the name of the individual to whom the document was issued, and the name conforms to the name in the individual’s voter registration record.
“(2) The document shows a photograph of the individual to whom the document was issued.
“(3) The document includes an expiration date, and the document:
“(A) is not expired; or
“(B) expired after the date of the most recent general election.
“(4) The document was issued by the United States or the state of Indiana.”

 To obtain a photo identification card a person must present at least one “primary” document, which can be a birth certificate, certificate of naturalization, U. S. veterans photo identification, U. S. military photo identification, or a U. S. passport. Ind. Admin. Code, tit. 140, §7-4-3 (2008), http://www.in.gov/legislative/iac/T01400/A00070.pdf?. Indiana, like most States, charges a fee for obtaining a copy of one’s birth certificate. This fee varies by county and is currently between $3 and $12. See Indiana State Department of Health Web page, http://www.in.gov/isdh/ bdcertifs/lhdfees/toc.htm. Some States charge substantially more. Affidavit of Robert Andrew Ford, App. 12.

 As petitioners note, Brief for Petitioners in No. 07-21, p. 17, n. 7, and the State’s “Frequently Asked Questions” Web page states, it appears that elderly persons who can attest that they were never issued a birth certificate may present other forms of identification as their primary document to the Indiana BMV, including Medicaid/Medicare cards and Social Security benefits statements, http://www.in.gov/faqs.htm; see also Ind. Admin. Code, tit. 140, § 7-4-3(a) (“The commissioner or the commissioner’s designee may accept reasonable alternate documents to satisfy the requirements of this rule”).

 Presumably most voters casting provisional ballots will be able to obtain photo identifications before the next election. It is, however, difficult to understand why the State should require voters with a faith-based objection to being photographed to cast provisional ballots subject to later verification in every election when the BMV is able to issue these citizens special licenses that enable them to drive without any photo identification. See Ind. Code Ann. § 9-24-1 l-5(c) (West Supp. 2007).

 Three comments on Justice Souter’s speculation about the nontrivial burdens that SEA 488 may impose on “tens of thousands” of Indiana citizens, post, at 209 (dissenting opinion), are appropriate. First, the fact that the District Judge estimated that when the statute was passed in 2005, 43,000 citizens did not have photo identification, see 458 F. Supp. 2d 775, 807 (SD Ind. 2006), tells us nothing about the number of free photo identification cards issued since then. Second, the fact that public transportation is not available in some Indiana counties tells us nothing about how often elderly and indigent citizens have an opportunity to obtain a photo identification at the BMV, either during a routine outing with family or friends or during a special visit to the BMV arranged by a civic or political group such as the League of Women Voters or a political party. Further, nothing in the record establishes the distribution of voters who lack photo identification. To the extent that the evidence sheds any light on that issue, it suggests that such voters reside primarily in metropolitan areas, which are served by public transportation in Indiana (the majority of the plaintiffs reside in Indianapolis and several of the organizational plaintiffs are Indianapolis organizations). Third, the indigent, elderly, or disabled need not “travel all the way to their county seats every time they wish to vote,” post, at 236, if they obtain a free photo identification card from the BMV. While it is true that obtaining a birth certificate carries with it a financial cost, the record does not provide even a rough estimate of how many indigent voters lack copies of their birth certificates. Supposition based on extensive Internet research is not an adequate substitute for admissible evidence subject to cross-examination in constitutional adjudication.

 Brief for Petitioners in No. 07-25, pp. 6-9. Fifty-two Republican House members voted for the bill, 45 Democrats voted against, and 3 Democrats were excused from voting. 3 Journal of the House of Representatives of the State of Indiana, Roll Call 259 (Mar. 21,2005). In the Senate, 33 Republican Senators voted in favor and 17 Democratic Senators voted against. 3 Journal of the Senate of the State of Indiana, Roll Call 417 (Apr. 12, 2005).