HELENE N. WHITE, Circuit Judge
(concurring in part and dissenting in part).
Except with respect to the remedy, I join in the affirmance but arrive there by a different route.
I
First, I think it clear that the elimination of non-UOCAVA voters’ access to in-person absentee ballots after 6 p.m. the Friday before, the election was not a fluke, but rather the considered intent of a majority of Ohio’s legislators.
A
In enacting H.B. 194[1] and H.B. 224[2] the Ohio General Assembly attempted to treat all voters equally by imposing a uniform in-person absentee-voter deadline. H.B. 194 included a new section, 3509.01(B)(3),[3] imposing the 6 p.m. Friday deadline for in-person absentee voters, but neglected to amend parallel sections 3509.03(1) and 3511.02(C)(12), which permitted non-UOCAVA and UOCAVA voters to obtain and submit in-person absentee ballots at their local election boards until the close of regular business the day before election day (PID 418-19, 421, 436). The prior statute also contained a provision that applied only to UOCAVA voters, section 3511.10, allowing them to obtain and vote by in-person absentee ballot until the polls close on election day. The legislature apparently caught this provision, and amended that section in H.B. 194, placing UOCAVA voters on the same footing as non-UOCAVA voters by allowing them in-person absen *438 tee-voting “during the time that absent voter’s ballots may be cast in person before an election.” (PID 441) After the legislature realized that it had failed to amend existing provisions that permitted voters to obtain and vote by in-person absentee ballots through the Monday before election day, it passed H.B. 224 by unanimous vote and amended sections 3509.03(1) and 3511.02(0(12) to make all deadlines uniform (PID 580, 590, 974, 993). Thus, the combined effect of H.B. 194 and H.B. 224 was to eliminate weekend voting for everyone; the only difference between UOCAVA and non-UOCAVA voters was that for non-UOCAVA voters only one section of the prior law required amendment, and for UOCAVA voters two sections required amendment, one of which was amended by H.B. 194 and the other by H.B. 224. When H.B. 194 was stayed by the referendum certification and later repealed by S.B. 295,[4] the provision of H.B. 194 that added the Friday 6 p.m. deadline was no longer effective, but the original versions of sections 3509.03(1) and 3511.02(0(12) had been amended by H.B. 224 to reflect the Friday deadline, and the effect of that statute was not suspended. Further, the amendment to section 3511.10 that had made UOCAVA absentee-voting hours consistent with the new Friday deadline was also suspended, resulting in the reinstatement of the language allowing UOCAVA absentee-voting through election day and a conflict between the two provisions relating to UOCAVA voters — the original version providing for in-person absentee voting until the polls close, and the H.B. 224 deadline that corresponded to the same H.B. 224 non-UOCAVA deadline of 6 p.m. Friday (PID 791-93, 804-05, 809-10).
When considering H.B. 295, the legislature understood that sections 3509.03(1) and 3511.02(0(12) had been amended by H.B. 224, not H.B. 194, and debated whether to repeal H.B. 224 as well. The vote was divided along party lines. Thus, notwithstanding assertions to the contrary, there is no question that the failure to repeal H.B. 224 at the same time H.B. 194 was repealed was not inadvertent. That is, the legislature knew that the net effect of repealing H.B. 194 and enacting S.B. 295 would be that the Friday deadlines of H.B. 224 would survive the repeal of H.B. 194. It is less clear, however, whether the legislature was aware that another provision of the former statute, section 3511.10, had not been amended by H.B. 224, but by H.B. 194, and therefore that provision would continue in its unamended state and provide for a conflicting end-of-election-day deadline for in-person absentee voting by UOCAVA voters (PID 809-10).
B
Section 3509.03(1) ends in-person nonUOCAVA absentee voting at 6 p.m. the Friday before election day. It is silent regarding all other hours and days for in-person absentee voting once voting begins, except that section 3501.10(B) requires election offices to remain open until 9 p.m. on the last day of registration. The statute does not prohibit a county board of elections from permitting in-person absentee voting in the evenings or during the weekends preceding the final pre-electionday weekend. Nevertheless, Secretary Husted issued a directive setting mandatory hours and forbidding local elections offices from maintaining night and weekend hours for non-UOCAVA voters.[5] This di *439 rective is incorporated in the voting restrictions plaintiffs challenge and the court ruled unconstitutional. Therefore, I consider both section 3509.03(1) and the Secretary’s directive in considering the burden on non-UOCAVA voters.
II
There is no constitutional right to an absentee ballot. This is made clear in McDonald v. Board of Election Commissioners, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969), Prigmore v. Renfro, 356 F.Supp. 427 (N.D.Ala.1972), summ. aff'd, 410 U.S. 919, 93 S.Ct. 1369, 35 L.Ed.2d 582 (1973), O’Brien v. Skinner, 414 U.S. 524, 94 S.Ct. 740, 38 L.Ed.2d 702 (1974), and Goosby v. Osser, 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973). The Constitution protects the right to vote, and it is only when there is no alternative vehicle for voting that the Supreme Court has found a right to an absentee ballot. Compare Skinner, 414 U.S. at 529-31, 94 S.Ct. 740 and Goosby, 409 U.S. at 519-23, 93 S.Ct. 854 with McDonald, 394 U.S. at 807-09, 89 S.Ct. 1404 and Prigmore, 356 F.Supp. 427. These absentee-ballot cases applied the rational-basis test to claims of entitlement to an absentee ballot as well as to equal protection challenges based on differentiations between voters with regard to absentee ballots, and recognized the state interest in regulating elections. One may understandably ask, then, how Ohio’s restrictions on in-person absentee voting can violate the Constitution. For me, the answer is that the Supreme Court has since applied the Anderson/Bwrdick[6] balancing test in evaluating a state’s interest in the regulation of elections, and that in applying that test, it is proper to look at the facts on the ground in Ohio.
Ill
The instant case raises several preliminary questions that affect the result. The first is which standard governs our consideration of plaintiffs’ claims — the rational-basis test employed in the absentee-ballot cases, or the more recent Anderson/Bur-dick balancing test, which weighs the burden on the right to vote against the state’s important regulatory interests. The Supreme Court has not decided an absentee-ballot case since the Anderson/Bwrdick test was announced, but two circuit courts have, and both applied the balancing test. In Price v. New York State Board of Elections, 540 F.3d 101 (2d Cir.2008), the Second Circuit considered a challenge to New York statutes that permitted absentee voting in all elections except county party committee elections. The court rejected New York’s argument that rational-basis review should apply, analyzed the case under Anderson/Burdick, and found New *440 York’s interests did not justify the burden on voters. Price, 540 F.3d at 107-12. In Griffin v. Roupas, 385 F.3d 1128 (7th Cir. 2004), the Seventh Circuit considered a challenge brought by Illinois working mothers who asserted a constitutional right to vote by absentee ballot (or some other alternative means) on the same basis as other voters who were granted the right to vote by absentee ballot because, like the other voters, they too had great difficulty voting between 6 a.m. and 7 p.m. on election day. Although the court denied the challenge, it applied the Anderson/Burdick balancing test. See Griffin, 385 F.3d at 1130-33.
Thus, I agree with the district court and the majority that the Anderson/Burdick balancing test is, indeed, the proper test. The Supreme Court has applied this test in its election jurisprudence since Anderson, see, e.g., Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008), and the test is flexible enough to approximate the rational-basis test when appropriate, i.e., where the burden is slight, the required showing by the state is correspondingly light.
IV
In applying this balancing test, I cannot agree with the majority’s assertion that “Plaintiffs introduced extensive evidence that a significant number of Ohio voters will in fact be precluded from voting without the additional three days of in-person early voting. (See, e.g., R. 34-32, Pls.’ Ex. 28, at 2.)” Maj. Op. at 431. If that were in fact the case, this would be a simple matter. The burden would be great and the rationales offered by Ohio, which are plausible and rational on their face but find little support in the record, would not outweigh the burden on those precluded from exercising their right to vote. However, though the record clearly establishes that a significant number of Ohio voters found it most convenient to vote after hours and the weekend before the election, the study did not consider the extent to which these voters would or could avail themselves of other voting options, either by mail ballot or in-person absentee ballot at other times, or in-person voting on election day (PID 1053-54). Convenience cannot be equated with necessity without more. Thus, it cannot be fairly said that there was evidence that a significant number of Ohio voters will be precluded from voting unless weekend and after-hours voting is restored.
Nevertheless, the burden may be substantial without being preclusive. A report by the Franklin County Board of Elections concluded that in-person early voting accounted for 9 percent of all ballots cast in the 2008 election, that a disproportionately higher number of African-Americans voted early and, most significantly, that 82 percent of all early in-person votes were cast either after hours on weekdays, on weekends, or the Monday before the election (PID 1068). A study by a voter advocacy group indicating that restrictions on in-person early voting would disproportionately affect African-American voters in Cuyahoga County revealed that African-Americans in that county had voted in disproportionately large numbers during extended hours and weekends, and in the three days before the 2008 general election, although they had the option of voting by mail and in-person during regular business hours; and that restricting in-person early voting in 2012 would likely lead to crowded conditions during regular board hours, raising concern that voters would find it necessary to abandon their attempts to vote due to extremely long wait times (PID 1077, 1082-83). To be sure, these studies as well do not establish that voters will be precluded from voting if *441 after-hours and weekend in-person absentee voting is not restored. But they are strong evidence that a significant number of voters in Ohio’s two largest counties have come to depend on after-hours and weekend voting as a vehicle for exercising their right to vote.[7] '
Still, no case has held that voting has to be convenient. The question then is whether the elimination of in-person after-hours and weekend voting should be viewed in a vacuum — as if plaintiffs were simply asserting that because of their long work hours and other demographics they should be able to vote after hours and on weekends so that they can get the full benefit of early in-person voting — or in the context of Ohio voting over the last decade, which includes Ohio’s remedial grant of such extended in-person absentee-voting opportunities, the substantial exercise of that right, and the boards of Ohio’s largest counties’ reliance on the availability of such voting. If the weighing must be done in the abstract, I would be compelled to dissent because the election case law does not support the proposition that there is a constitutional right to have voting on terms that are equally convenient for all voters. I conclude, however, that the Anderson/Burdick balancing in this case should not be divorced from reality, and that both the burden and the legitimate regulatory interest should be evaluated in context.
V
The key distinguishing factor here is that Ohio voters were granted the statutory right to in-person absentee voting through the close of business hours on the Monday before election day, and the election boards of the largest counties broadly embraced and facilitated that right, in response to the unacceptably burdensome situation at many Ohio polling sites during the 2004 election where, in some counties, voters were required to stand in line for long hours and until late at night (PID 1482-40, 1657-58). Thus, section 3509.03(1), as originally enacted, was intended to relieve the pressure on the system resulting from heavy turnout on election day. Further, experience shows that Ohio voters have taken increasing advantage of in-person absentee voting. In the last presidential election, close to 500,000 Ohio voters cast in-person absentee ballots, of which it appears a little over 100,000 were cast the weekend before the election (PID 1053). Further, in the 2008 election, the residents of Ohio’s two largest counties, Cuyahoga and Franklin, cast over 100,000 in-person absentee votes, the vast majority during after-hours and on weekends. These counties have budgeted and planned for the expected extended hours and weekend in-person absentee voting, especially the weekend before the election (PID 1432-10, 1057-58). They *442 have not budgeted or planned for any increase in election-day voting caused by the elimination of weekend and after-hours voting, and fear that the restrictions on the hours for in-person absentee voting will cause some citizens not to vote and others to vote on election day, leading to long lines and unreasonable delays at the polls, which in turn will cause some voters to abandon their attempts at voting, as happened in 2004.
Although states are permitted broad discretion in devising the election scheme that fits best with the perceived needs of the state, and there is no abstract constitutional right to vote by absentee ballot, eleventh-hour changes to remedial voting provisions that have been in effect since 2005 and have been relied on by substantial numbers of voters for the exercise of their franchise are properly considered as a burden in applying Anderson/Burdick balancing. To conclude otherwise is to ignore reality. This does not mean that states cannot change their voting schemes, only that in doing so they must consider the burden the change and the manner of implementing the change places on the exercise of the right to vote.
VI
Defendants argue that the new restricted in-person absentee voting hours are necessary to relieve election workers and election officials from the burdens of in-person absentee voting immediately before the election, and to assure uniformity in absentee-voting hours throughout the state. These are legitimate regulatory interests; but neither bears any relation to the elimination of all after-hours and weekend voting preceding the final weekend. Regarding the final weekend, these concerns provide little explanation for the elimination of the right to obtain an absentee ballot in person the Saturday before the election, when election workers are still honoring mail requests for absentee ballots until noon pursuant to statute. And in weighing the elimination of in-person absentee voting the remainder of the weekend, the record shows that many of the specific complaints voiced by election officials stemmed from in-person absentee voting the Monday before the election, not the entire weekend.[8] The desire for uniformity has little to do with the elimination of all weekend and after-hours in-person voting. Defendants offer no explanation for curtailing hours other than on the final weekend, and uniformity without some underlying reason for the chosen rule is not a justification in and of itself. Nor is there a showing that eliminating all weekend and after-hours voting will in fact produce uniform access, as opposed to uniform hours.
Given the studies presented regarding the heavy use of in-person after-hours and weekend voting, and the legitimate concerns of Ohio’s largest counties and their voters regarding the smooth and efficient running of the 2012 presidential election, I conclude that defendants’ legitimate regulatory interests do not outweigh the burden on voters whose right to vote in the upcoming election would be burdened by the joint effect of the statute and the directive.
Finally, I conclude that this is the unusual case where distinctions between UOCAVA and non-UOCAVA voters cannot support the disparate treatment at issue. The record adequately supports the district court’s conclusion that the State’s *443 proffered reason for the distinction between UOCAVA and non-UOCAVA voters — concern that military voters might be deployed sometime between Friday evening and election day — had no relation to the statutory distinction and is not supported by the Secretary’s directive.
VII
Turning to the question of remedy, I understand the district court to have required Secretary Husted to restore in-person absentee voting through the Monday preceding election day. I would remand the matter with instructions to give the Secretary and the General Assembly a short and finite period in which cure the constitutional defects, with the understanding that a failure to do so will result in the reinstatement of the preliminary injunction.

. Amended Substitute House Bill Number 194, 2011 Ohio Laws 40.

. Amended Substitute House Bill Number 224, 2011 Ohio Laws 46.

.Ohio Rev.Code § 3509.01(B)(3).

. Substitute Senate Bill Number 295, 2012 Ohio Laws 105.

. Secretary Husted directed all counties to adopt the following regular business hours:
*439 • 8:00 a.m. to 5:00 p.m., Tuesday through Friday, from October 2, 2012 through October 5, 2012;
• 8:00 a.m. to 9:00 p.m., Tuesday, October 9, 2012; [mandated by Section 3501.10(B) ]
• 8:00 a.m. to 5:00 p.m., Wednesday through Friday, from October 10, 2012 through October 12, 2012;
• 8:00 a.m. to 5:00 p.m., Monday through Friday, from October 15, 2012 through October 19, 2012;
• 8:00 a.m. to 7:00 p.m., Monday through Friday, from October 22, 2012 through October 26, 2012;
• 8:00 a.m. to 7:00 p.m., Monday through Thursday, [from] October 29, 2012 through November 1, 2012; and
• 8:00 a.m. to 6:00 p.m., Friday, November 2, 2012.
Directive 2012-35 (PID 1481) (internal footnotes omitted). Any voter in line at the end of these regular business hours must be permitted to make his or her application and vote. Id.

. Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), and Burdick v. Takushi, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).

. Justices Scalia, Thomas and Alito would hold that the weighing of the burden on voters against the state’s legitimate regulatory interests must be conducted by looking at the electorate at large, not a particular group of voters who may be burdened disproportionately by an otherwise nondiscriminatory law. See Crawford, 553 U.S. at 205-06, 128 S.Ct. 1610 (Scalia, J., concurring). However, Justice Stevens' opinion in Crawford (the narrowest opinion, thus the controlling one for our purposes) examined the evidence and concluded that, "on the basis of the record that has been made in this litigation, we cannot conclude that the statute imposes ‘excessively burdensome requirements’ on any class of voters.” Id. at 202, 128 S.Ct. 1610 (quoting Storer v. Brown, 415 U.S. 724, 738, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974)). Justice Stevens’ opinion does not reveal any disinclination to evaluate evidence of an excessive burden; rather, the purely anecdotal evidence did not support that the voter-ID statute at issue imposed such a burden. See Crawford, 553 U.S. at 197-203, 128 S.Ct. 1610.

. In 2009, former Secretary of State Jennifer Brunner suggested that consideration be given to the pressure on the election commissions caused by in-person absentee voting and that the voting period be shortened from 30 to 20 days, with in-person absentee voting ending at 5 p.m. the Sunday before the election.