WILLIAMS, Circuit Judge,
with whom WOOD, Chief Judge, and POSNER, ROVNER, and HAMILTON, Circuit ' Judges, join, dissenting from the denial of rehearing en banc.
After absentee ballots had already been mailed and then returned with ballots cast, and with this November’s elections fast approaching, the panel issued an order staying the district court’s injunction and authorizing Wisconsin to require voter identification in elections that are only weeks away. Our court should not have altered the status quo in Wisconsin so soon before its elections. And that is true whatever one’s view on the merits of the case. Our stay order was improper, and it should not stand.
This stay will substantially injure numerous registered voters in Wisconsin, and the public at large, with no appreciable benefit to the state. Cf. Nken v. Holder, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (providing factors court is to consider when deciding whether to issue stay: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies). To alter the status quo so soon before an election, and with the state’s “election machinery already in progress,” Reynolds v. Sims, 377 U.S. 533, 585, 84 S.Ct. 1362, 12 L.Ed.2d 506 (U.S.1964), will have significant impact. The district court found that 300,000 registered voters — registered voters, not just persons eligible to vote — lack the most common form of identification needed to vote in the upcoming elections in Wisconsin. (To put this number in context, the 2010 governor’s race in Wisconsin was decided by 124,638 votes and the election for United States Senator by 105,041 votes.) And how does the state reply to the fact that numerous registered voters do not have qualifying identification with elections so imminent? It brazenly responds that the district court found that “more than 90% of Wisconsin’s registered voters already have a qualifying ID” and can vote and that “the voter ID law will have little impact on the vast majority of voters.” But the right to vote is not the province of just the majority. It is not just held by those who have cars and so already have driver’s licenses and by those who travel and so already have passports. The right to vote is also held, and held equally, by all citizens of voting age. It simply cannot be the answer to say that 90% of registered voters can still vote. To say that is to accept the disenfranchisement of 10% of a state’s registered voters; for the state to take this position is shocking.
It is simply impossible — as a matter of common sense and of logistics — that hundreds of thousands of Wisconsin’s voters will both learn about the need for photo identification and obtain the requisite identification in the next 36 days (26 business days). Doing so would require the state to issue around 6,000 photo identifications per day up to the election. Yet obtaining the necessary identification can take months for voters who were born outside Wisconsin and who lack birth certificates. *499 Make no mistake, that is no small number of the registered voters at issue. See Frank v. Walker, 17 F.Supp.3d 837, at 855-86, 2014 WL 1775432, at *13 (E.D.Wis.2014) (nearly 50% of eligible voters in Milwaukee County who lack both accepted photo identification and valid birth certificate were born outside Wisconsin). And for the registered voter in Wisconsin lucky enough to already have all the documents who must then get identification through the Department of Motor Vehicles, most DMV offices in Wisconsin are only open two days a week (and these are weekdays, not weekends).
Those thousands of absentee ballots that were mailed to voters before the panel’s order? They do not count when returned in the manner their instructions direct, for they do not comply with the Wisconsin voter identification law. That is true for the absentee ballots that voters had already sent back in before the panel’s order, and any returned from here until the election. Cf. Nader v. Blackwell, 230 F.3d 833, 834-35 (6th Cir.2000) (improper to change party-identification procedures after absentee ballots already mailed); Perry v. Judd, 471 Fed.Appx. 219, 227 (4th Cir. Jan. 17, 2012) (unpublished) (changing rules after absentee ballots printed would be improper).
Changing the rules so soon before the election is contrary not just to the practical realities of an impending election, but it is inconsistent with the Supreme Court’s approach to such cases. In Purcell v. Gonzalez, 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam), for example, the district court had declined to enjoin a voter ID law, but then the Ninth Circuit issued an emergency stay. The Supreme Court unanimously reversed the appellate court’s last-minute reversal of the district court. It cautioned that court orders affecting elections can lead to “voter confusion and consequent incentive to remain away from the polls,” and it said that this risk increases as an election draws closer. Id. at 4-5, 127 S.Ct. 5. Purcell was not the first time the Court recognized these realities. See, e.g., Williams v. Rhodes, 393 U.S. 23, 34-35, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (denying requested relief, despite unconstitutionality of statute, because “the confusion that would attend such a last-minute change poses a risk of interference with the rights of other Ohio citizens” and “relief cannot be granted without serious disruption of election process”); Reynolds, 377 U.S. at 585 (“where an impending election is imminent and a State’s election machinery is already in process, equitable considerations might justify a court in withholding the granting of immediately effective relief’); see also Westermann v. Nelson, 409 U.S. 1236, 1236-37, 93 S.Ct. 252, 34 L.Ed.2d 207 (1972) (Douglas, J., in chambers) (denying request to have candidate’s name printed on ballot where absentee ballots had already been sent and returned even though “[t]he complaint may have merit” because “the time element is short,” the “election machinery is already underway,” and “orderly election processes would likely be disrupted by so late an action”). Here, too, the status quo before the panel’s order should be restored — the status quo that all in Wisconsin had been operating under, and the status quo that if not restored will irreparably harm registered voters in Wisconsin. We, as “the Court of Appeals,” are “required to weigh ... considerations' specific to election cases,” and to “give deference to the discretion of the District Court,” and we must do this because the Supreme Court tells us to. Purcell, 549 U.S. at 4, 127 S.Ct. 5. Weighing those considerations properly here would mean the stay would not stand.
A full discussion on the merits will wait for another day, but a likelihood of success on the merits is one factor in the stay decision, see Nken, 556 U.S. at 434, 129 S.Ct. 1749, and the panel’s grant of the *500 stay seems premised on a conclusion that the state is likely to succeed on the merits in light of Crawford v. Marion County Election Board, 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008). That premise is dead wrong. The Supreme Court opinion in Crawford made very clear that its decision was specific to the evidence in the record in that case. Or, to be more precise, to the complete and utter lack of evidence. The Court pointed out that the district court there found that the petitioners “had ‘not introduced evidence of a single, individual Indiana resident who will be unable to vote as a result of [Indiana’s voter identification law] or who will have his or her right to vote unduly burdened by its requirements.’ ” Id. at 187, 128 S.Ct. 1610 (plurality opinion of Stevens, J.) (quoting Ind. Democratic Party v. Rokita, 458 F.Supp.2d 775, 783 (S.D.Ind.2006)). It noted the district court’s emphatic rejection of the plaintiffs’ expert report, id., and stated that the record did not even contain the number of registered voters in Indiana without voter identification, id. at 200, 128 S.Ct. 1610. The Court found that “the deposition evidence presented in the District Court does not provide any concrete evidence of the burden imposed on voters who currently lack photo identification,” id. at 201, 128 S.Ct. 1610, and stated that “[t]he record says virtually nothing about the difficulties faced by either indigent voters or voters with religious objections to being photographed,” id. The single affidavit of one woman who was denied photo identification because she did not have an address, said the Court, “gives no indication of how common the problem is.” Id. at 202, 128 S.Ct. 1610. And so it was no surprise that the Court concluded that “the evidence in the record is not sufficient to support a facial attack on the validity of the entire statute.” Id. at 189, 128 S.Ct. 1610. The Court reiterated that it was deciding the case based on the record before it at the end of its analysis, too, stating, “In sum, on the basis of the record that has been made in this litigation, we cannot conclude that the statute imposes ‘excessively burdensome requirements’ .on any one class of voters.” Id. at 202, 128 S.Ct. 1610.
The record that has been made in this litigation is entirely different from that made in Crawford. In every way. The plaintiffs put on detailed evidence of the substantial burdens Wisconsin’s voter identification law imposes on numerous voters. They put on multiple witnesses. They put on qualified experts. They made this a record-heavy case. And after hearing the voluminous evidence presented to the federal district court in Wisconsin, the experienced judge concluded that Wisconsin’s voter identification law had a disproportionate impact on African Americans and Latinos, was unconstitutional, and violated the Voting Rights Act. (Note also that while the panel’s order called the Wisconsin and Indiana laws “materially identical,” the Wisconsin law does not have an affidavit option that allows indigent voters without identification to vote provisionally as the Indiana law at issue in Crawford did. Cf. Crawford, 553 U.S. at 185-86, 128 S.Ct. 1610 (“The severity of that burden is, of course, mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted” if affidavit executed at clerk’s office within ten days); see Ind.Code § 311.75-5-2.5(c).) Crawford simply does not direct a victory to the state in this case.
Nor will the state be irreparably injured absent a stay. The Supreme Court has said that irreparable harm to the party seeking the stay is one of the two “most critical” factors in deciding whether to issue a stay, Nken, 556 U.S. at 434, 129 S.Ct. 1749, yet it is very hard to see any irreparable harm to the state. The state has conducted hundreds of elections without a *501 voter identification requirement. It had been preparing for months to do the same again. (Indeed, the voter identification law was designed to have a rollout period of 8 months before a primary and 16 months before a general election — not mere weeks.) The state has not pointed to a single instance of an in-person impersonation at the polling place in any of these elections. Waiting until the 2016 election for the state to implement whatever law is in place on the merits will give it plenty of time to properly implement that law.
Moreover, that stays were issued in same-sex marriage cases means nothing for this eve-of-election case. The uncertainty, confusion, and long-term harm that would result from allowing thousands of marriages that are valid for a time but might later be wiped away led to stays in those cases.[1] (And of course there is no presumption against enjoining unconstitutional state laws pending appeals, lest the panel opinion leave a contrary impression.) The scale balancing the harms here, on the other hand, is firmly weighted down by the harm to the plaintiffs. Should Wisconsin citizens not have their votes heard, the harm done is irreversible. And as the district court found, for many voters without qualifying identification, the burdens associated with obtaining such identification “will be anything but minor” and will deter a substantial number of eligible voters from voting. On the other side of the scale is the state’s interest in guarding against a problem it does not have and has never had. The state can wait one more election to implement its law if it is found to be constitutional.
Our court should not accept, as the state is willing to do, the disenfranchisement of up to 10% of Wisconsin’s registered voters. We certainly should not do so when there is no evidence in Wisconsin whatsoever of the type of fraud the law is designed to prevent against. Our court should not have altered the status quo in Wisconsin so soon before its elections. The district court’s injunction against the implementation of the Wisconsin law should remain in place, and the panel’s order lifting that injunction should be revoked.

. Take Utah's experience, for example, where the Tenth Circuit did not initially issue a stay. Over 1,000 same-sex couples obtained marriage licenses after the district court enjoined the state’s law. Jessica Miller, 10th Circuit Court: Utah’s Same-Sex Marriage Ban Is Unconstitutional, June 26, 2014, available at http://www.sltrib.com/sltrib/news/58114139-78/ marriage-court-utah-sex.html.csp. The Supreme Court stayed the district court’s injunction, the law against same-sex marriage went back into effect, and now those couples are in limbo as to the validity of their marriage licenses. See Herbert v. Evans, No. 14A65, -U.S.-, 135 S.Ct. 16, 189 L.Ed.2d 868, 2014 WL 3557112 (S.Ct. July 18, 2014).