KELLY, Circuit Judge, dissenting.
 

 A state law that burdens the right of a discrete class of voters to access the ballot violates the Equal Protection Clause unless relevant and legitimate state interests sufficiently justify the burden. In a thorough opinion premised on largely uncontested facts, the district court determined that North Dakota likely violated the Constitution by passing a law requiring all prospective voters to present a form of identification that is both difficult and costly to obtain. The unrebutted evidence demonstrates that the new law will have a particularly devastating effect on eligible Native American voters, thousands of whom will effectively lose the right to vote. North Dakota has proffered no evidence to justify the law's imposition. The district court's conclusion that the law likely runs afoul of the Equal Protection Clause was eminently reasonable and not an abuse of discretion. I would therefore affirm the district court's order granting a preliminary injunction.
 

 I
 

 A
 

 This case began in January 2016 when seven Native American voters sued to enjoin two North Dakota voter-identification laws. The first, H.B. 1332, required prospective voters to show identification bearing "the individual's residential address and date of birth" before obtaining a ballot.
 
 See
 
 2013 N.D. Laws ch. 167, sec. 5 (amending
 
 N.D. Cent. Code § 16.1-05-07
 
 ). The law also eliminated the previously existing "fail-safe option," which allowed individuals without proper identification to vote after signing a sworn affidavit attesting to their credentials.
 
 See
 

 id.
 

 sec. 5, 8. The second law, H.B. 1333, restricted the types of acceptable identification. Previously, any form of identification issued by the state or a tribal government was permitted. With two narrow exceptions not relevant here, after H.B. 1333, the only forms of identification that could be used to vote were a "current driver's license or nondriver identification card issued by the department of transportation" or an "official form of identification issued by a tribal government." 2015 N.D. Laws ch. 157, sec. 2 (amending
 
 N.D. Cent. Code § 16.1-05-07
 
 ).
 

 Plaintiffs alleged that the new laws unduly burdened the rights of all voters in North Dakota and imposed particularly disproportionate burdens on Native Americans. They sought relief under Section 2 of the Voting Rights Act of 1965,
 
 52 U.S.C. § 10301
 
 ; the Equal Protection Clause, U.S. Const. amend. XIV ; and various provisions of the North Dakota Constitution. In support of their motion for a preliminary injunction, plaintiffs submitted lay and expert evidence, none of which the Secretary refuted or challenged. The unrebutted statistical evidence demonstrated that 23.5% of Native Americans lack a valid form of
 identification, compared to only 12% of non-Native Americans. The district court concluded that the uncontested evidence established that the two laws likely imposed excessive and disproportionate burdens on Native Americans in violation of the Equal Protection Clause.
 
 Brakebill v. Jaeger
 
 (
 
 Brakebill I
 
 ), No. 1:16-CV-008,
 
 2016 WL 7118548
 
 , at *4, *10 (D.N.D. Aug. 1, 2016).
 

 The district court's lengthy opinion identified many distinct obstacles that make it more difficult for Native Americans to obtain acceptable identification. One is cost. Acquiring identification costs money: replacing a lost or stolen nondriver's identification card costs eight dollars and obtaining a driver's license costs fifteen to twenty-five dollars.
 
 Id.
 
 at *6-7. Approximately half of Native Americans who lack an acceptable form of identification also lack the underlying documents necessary to obtain it,
 
 id.
 
 at *4, and obtaining those documents also entails an expense. For example, obtaining a birth certificate costs at least seven dollars.
 
 Id.
 
 at *5. A passport costs more than one hundred dollars.
 
 Id.
 
 Because Native Americans in North Dakota "disproportionally live in severe poverty,"
 
 id.
 
 at *8, these financial burdens potentially prohibit them from voting.
 

 Even if the direct cost of acquiring identification was not prohibitive, Native Americans are far less likely to have access to any motor vehicle and, on average, must travel twice as far as non-Native Americans to visit a Driver's License Site (the only place to obtain qualifying state-issued identification).
 
 Id.
 
 at *4. There are no Driver's License Sites on any of the reservations in North Dakota.
 
 Id.
 
 at *6. Twenty-three of the state's twenty-seven Driver's License Sites are open fewer than five days a week.
 
 Id.
 
 Many are open only for a few hours one day a month.
 
 Id.
 
 The lack of easy access to these locations presents a disproportionate burden for Native Americans, who are more likely to have difficulty traveling and taking time off work than non-Native Americans. Id.
 

 H.B. 1332's requirement that any identification bear the individual's residential address creates several independent obstacles. For someone who is homeless, the residential-address requirement is an insurmountable barrier. It is also a particular problem for Native Americans. Many tribal-issued identification cards do not list a residential address simply because homes on reservations often do not have one.
 
 Id.
 
 at *5. Obtaining a state-issued driver's license or nondriver's identification card requires at least two documents reflecting the individual's residential address.
 
 See
 

 Identification Requirements
 
 , N.D. Dep't of Transp., at 3, https://www.dot.nd.gov/divisions/driverslicense/docs/proof-of-identification-documents.pdf (last updated Jan. 11, 2017). The unrebutted evidence shows that 21.6% of Native Americans do not have two qualifying documents bearing their residential address.
 
 Brakebill I
 
 ,
 
 2016 WL 7118548
 
 , at *5. Even those who obtain a state-issued identification card face the burden of updating their address when they move, which requires either access to the internet or the ability to travel in person to a Driver's License Site. Fewer than half of Native Americans in North Dakota have internet access, a problem that is particularly acute in rural areas and on reservations.
 
 Id.
 
 at *7.
 

 Importantly, all of this evidence was uncontested. In response to plaintiffs' motion, the Secretary proffered no evidence whatsoever.
 
 Id.
 
 at *4. The Secretary merely argued that the laws were not more restrictive for Native Americans than for anyone else, a contention that the district court found "clearly belie[d]" by the record.
 
 Id.
 
 at *9. In short, the evidence established
 unequivocally that the laws imposed "substantial and disproportionate burdens" on Native Americans.
 
 Id.
 
 at *5.
 

 The district court then summarized the interest of the state in enforcing the two laws. It recognized that the state has a legitimate interest in safeguarding the integrity of its elections from voter fraud, but it found that this justification for the laws was "far outweigh[ed]" by the burden imposed by the laws on Native American voters.
 
 Id.
 
 at *10. In particular, H.B. 1332's elimination of the "fail-safe option" completely disenfranchised those "voters who simply cannot obtain a qualifying [identification] with reasonable effort."
 
 Id.
 
 The district court noted that North Dakota appeared to be the only state without any sort of fail-safe provision in its election laws.
 
 Id.
 
 at *13. The court estimated that, absent injunctive relief, more than 3,800 Native Americans would likely be denied the right to vote in the upcoming November 2016 general election.
 
 Id.
 
 at *11. After balancing the respective harms and the public interest, the district court concluded that plaintiffs had met their burden of establishing the necessity of a preliminary injunction. It enjoined the Secretary from enforcing the laws without a fail-safe option such as the previous provision permitting voters to sign an affidavit if they lacked a qualifying form of identification.
 

 The Secretary chose not to appeal the district court's order, and the injunction remained in place for the 2016 general election.
 

 B
 

 In April 2017, North Dakota passed a new law, H.B. 1369, which went into effect on July 1, 2017.
 
 See
 
 2017 N.D. Laws ch. 152. Like its predecessors, H.B. 1369 generally allows poll workers to accept only two forms of voter identification: (1) a North Dakota driver's license or nondriver's identification card; or (2) "[a]n official form of identification issued by a tribal government to a tribal member residing in this state."
 
 Id.
 
 sec. 2 (codified at
 
 N.D. Cent. Code § 16.1-01-04
 
 .1(3)(a) ). But H.B. 1369 makes several important changes to North Dakota's election laws, two of which are of particular relevance to this appeal.
 

 First, unlike H.B. 1332, which required the voter's identification to include "the individual's residential address," H.B. 1369 requires the identification to contain the individual's "[c]urrent residential street address in North Dakota."
 

 Id.
 

 (codified at
 
 N.D. Cent. Code § 16.1-01-04
 
 .1(2) ). This has been referred to as the "current RSA requirement." If the identification is missing the voter's current RSA, legal name, or date of birth, the voter may supplement the missing or outdated information with one of five documents: (1) a current utility bill; (2) a current bank statement; (3) a check issued by a federal, state, or local government; (4) a paycheck; or (5) a document issued by a federal, state, or local government.
 

 Id.
 

 (codified at
 
 N.D. Cent. Code § 16.1-01-04
 
 .1(3)(b) ).
 

 Second, H.B. 1369 replaces the fail-safe option with a new provisional ballot system (sometimes called a set-aside ballot system).
 
 See
 

 id.
 

 (codified at
 
 N.D. Cent. Code § 16.1-01-04
 
 .1(5) ). It provides that an individual who is unable to present a valid identification on election day may be allowed to mark a provisional ballot that will be set aside. For the ballot to be counted, the individual must "show a valid form of identification to either a polling place election board member if the individual returns to the polling place before the polls close, or to an employee of the office of the election official responsible for the administration of the election before the meeting of the canvassing board occurring on the sixth day after the election."
 

 Id.
 

 (codified at
 
 N.D. Cent. Code § 16.1-01-04
 
 .1(5) ). The
 law does not indicate who "the election official responsible for the administration of the election" is. Instead, it directs the Secretary to develop "uniform procedures" for implementing this provision.
 

 Id.
 

 (codified at
 
 N.D. Cent. Code § 16.1-01-04
 
 .1(6) ).
 

 In response to H.B. 1369, six of the original plaintiffs moved to amend their complaint, and one withdrew from the case. The Secretary then moved to dissolve the district court's previous injunction. Plaintiffs moved for a new preliminary injunction on the same grounds as the original injunction request. They also supplemented their request with updated evidence. As with the first injunction motion, the Secretary did not contest any of plaintiffs' evidence, and the district court concluded that the uncontested evidence established that the new law likely violated the Equal Protection Clause.
 
 See
 

 Brakebill v. Jaeger
 
 (
 
 Brakebill II
 
 ), No. 1:16-CV-008,
 
 2018 WL 1612190
 
 , at *2, *7 (D.N.D. Apr. 3, 2018).
 

 In addition to incorporating its prior discussion of the evidence submitted in connection with the first preliminary injunction, the district court recounted the updated statistical evidence: 19% of Native American eligible voters still lack one of the two forms of qualifying identification allowed under H.B. 1369, compared to only 11.6% of non-Native Americans.
 
 Id.
 
 at *2. Of those Native Americans without a valid identification, 65.6% lack the underlying documents they would need to obtain one.
 
 Id.
 
 And among those who would have a valid form of identification but for the current RSA requirement, 48.7% do not possess at least one of the supplemental documents accepted under H.B. 1369, compared to only 26.2% of non-Native American voters.
 
 Id.
 
 at *3.
 

 The district court noted that the current RSA requirement is a particularly harsh burden for those living on tribal reservations because, as the Secretary acknowledged, "Native American communities often lack residential street addresses," and many residents use only their mailing address, which is often a P.O. Box.
 
 Id.
 
 at *4. An individual without a current RSA-or, more accurately, without adequate proof of one-"will never be qualified to vote" under H.B. 1369.
 
 Id.
 
 Thus, the law "completely disenfranchises anyone who does not have a 'current residential street address[,]' ... includ[ing] homeless persons as well as many persons living on Native American reservations."
 
 Id.
 
 at *6.
 

 The district court concluded that several of the Secretary's arguments about the availability of identification cards were not supported by the evidence. Specifically, it found that the Secretary's claim that non-driver's identification cards are available for free was directly contradicted by the North Dakota Department of Transportation's website, which at the time clearly stated that the cards cost eight dollars, and by the testimony of at least one plaintiff who was charged such a fee.
 
 Id.
 
 at *6 ;
 
 see
 

 Brakebill v. Jaeger
 
 (
 
 Brakebill III
 
 ),
 
 905 F.3d 553
 
 , 562 & n.5 (8th Cir. 2018) (Kelly, J., dissenting). And it found that the Secretary's claim that poll workers would accept any identification issued by the Bureau of Indian Affairs (BIA) appeared to conflict with the plain text of H.B. 1369, which requires identification to be issued by a "tribal government" and makes no mention of the BIA, a federal agency.
 
 Brakebill II
 
 ,
 
 2018 WL 1612190
 
 , at *6. As for the Secretary's claim that poll workers would accept as a supplemental document any document, even a letter, from "tribal authorities" that contained the voter's name, date of birth, and current RSA, the district court expressed skepticism that most poll workers would recognize a letter as an "official form of identification issued by a tribal government."
 
 Id.
 
 at *5. The
 state had consistently interpreted this language-identical to that used in H.B. 1333-as requiring an official tribal identification card, not a letter. The Secretary produced no "official state administrative rule, regulation, policy, procedure, memorandum, or any other document or public pronouncement espousing" this "new-found interpretation of the law."
 
 Id.
 
 at *5.
 

 The court also criticized H.B. 1369's new provisional ballot system, which was intended to replace the fail-safe provision reinstated by the prior injunction. It noted that the provisional ballot system will not help any voter who is unable to obtain qualifying identification.
 
 Id.
 
 at *4-5. Those living on reservations without clear residential street addresses, for example, would never be able to have their votes counted under this procedure. Even voters with the means to obtain a driver's license or nondriver's identification card are unlikely to be able to visit a Driver's License Site, acquire the required identification, and return to the relevant election official within the six days following an election in order to have their ballot counted. And, the district court noted, the law "is vague and unclear as to where and to whom such a voter is to produce" his identification or supplemental documents, exacerbating the problems created by the rest of the law.
 
 Id.
 
 at *4.
 

 Overall, the district court explained, at least 4,998 otherwise eligible Native American voters lack a valid identification under H.B. 1369.
 
 Id.
 
 at *4. Approximately 48.7% of those individuals also lack adequate supplemental identification documents, meaning that at least 2,305 eligible Native American voters cannot vote under the new law.
 
 Id.
 

 Finally, the district court addressed the evidence of potential voter fraud in North Dakota. In short, there is none. The Secretary produced "no evidence of voter fraud in the past, and no evidence of voter fraud in 2016," when the first injunction remained in place.
 
 Id.
 
 at *6. At most, this left only "the theoretical possibility of voter fraud [that] exists with every election nationwide."
 
 Id.
 

 After weighing the competing interests at stake, the district court dissolved its prior injunction as moot and granted plaintiffs' request for a new preliminary injunction. The new injunction prevented the Secretary from enforcing only a few discrete subsections of H.B. 1369. First, the district court enjoined the current RSA requirement and ordered the Secretary to accept identification bearing a current RSA or a current mailing address, thereby accommodating the many Native American voters who lack identification bearing a current RSA. Second, consistent with the Secretary's litigation positions, the court required the Secretary to accept two additional forms of identification and supplemental documentation: (1) tribal identification cards issued by the BIA and (2) letters issued by tribal authorities. Finally, the district court instructed the Secretary to promulgate guidance on how voters could comply with the new provisional ballot system. H.B. 1369 already requires the Secretary to "develop uniform procedures" for implementing the system, 2017 N.D. Laws ch. 152, sec. 2 (codified at
 
 N.D. Cent. Code § 16.1-01-04
 
 .1(6) ), so this aspect of the injunction simply amounted to requiring the Secretary to comply with the law as written. The district court did not reinstate the affidavit fail-safe option.
 

 The Secretary appealed. He argues that plaintiffs lack standing to challenge the current RSA requirement because they all possess current RSAs. He also argues that the injunction permitting the use of identification bearing a mailing address will allow nonresidents to vote and will allow residents to vote in the wrong precincts.
 

 And he argues that plaintiffs, as members of the Turtle Mountain Band of Chippewa, cannot obtain an injunction requiring acceptance of BIA-issued identification cards because the BIA only issues cards to members of the Standing Rock Sioux tribe. Finally, he argues that the district court improperly ordered him to comply with his statutory duty to develop uniform procedures for the provisional ballot system. This court initially declined to stay enforcement of the preliminary injunction pending the appeal,
 
 Brakebill v. Jaeger
 
 ,
 
 905 F.3d 553
 
 , 555 (8th Cir. 2018), but then reversed course shortly before the November 2018 election and stayed the portions of the injunction requiring the Secretary to accept identification and supplemental documents bearing a current mailing address,
 
 Brakebill III
 
 ,
 
 905 F.3d at 561
 
 . The Supreme Court declined to vacate our stay, over the objection of two Justices.
 
 See
 

 Brakebill v. Jaeger
 
 , --- U.S. ----,
 
 139 S. Ct. 10
 
 ,
 
 202 L.Ed.2d 212
 
 (2018) (Ginsburg, J., dissenting).
 

 II
 

 As a threshold matter, the Secretary asserts that plaintiffs lack standing to challenge the current RSA requirement because they all possess residential street addresses. This argument misses the mark. The law does not just require voters to maintain a residence but to obtain and present a qualifying form of identification (or a qualifying supplemental document) reflecting that residence's address. This burden constitutes an injury-in-fact sufficient to confer Article III standing, regardless of whether the citizen has a residential street address or an identification reflecting it.
 
 Common Cause/Ga.
 
 ,
 
 554 F.3d at
 
 1352 ;
 
 see
 

 Brakebill III
 
 ,
 
 905 F.3d at 561
 
 (Kelly, J., dissenting). A plaintiff need not be completely disenfranchised to challenge a statute that makes voting more difficult.
 

 III
 

 In assessing the merits of the Secretary's appeal, the best place to begin is with the standard of review. It is well settled that a district court has "broad discretion when ruling on a request for preliminary injunction, and it will be reversed only for clearly erroneous factual determinations, an error of law, or an abuse of its discretion."
 
 Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs
 
 ,
 
 826 F.3d 1030
 
 , 1035 (8th Cir. 2016) (quoting
 
 Novus Franchising, Inc. v. Dawson
 
 ,
 
 725 F.3d 885
 
 , 893 (8th Cir. 2013) ). A factual finding will not be reversed on appeal merely because we are convinced that we would have decided the case differently. Rather, a finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."
 
 Anderson v. City of Bessemer City
 
 ,
 
 470 U.S. 564
 
 , 573,
 
 105 S.Ct. 1504
 
 ,
 
 84 L.Ed.2d 518
 
 (1985) (quoting
 
 United States v. U.S. Gypsum Co.
 
 ,
 
 333 U.S. 364
 
 , 395,
 
 68 S.Ct. 525
 
 ,
 
 92 L.Ed. 746
 
 (1948) ). We will not overturn a preliminary injunction for an abuse of discretion unless the district court failed to consider a relevant factor that should have been given significant weight, gave significant weight to an irrelevant or improper factor, or committed a clear error of judgment in weighing the proper factors.
 
 Planned Parenthood of Ark. & E. Okla. v. Jegley
 
 ,
 
 864 F.3d 953
 
 , 957 (8th Cir. 2017),
 
 cert. denied
 
 , --- U.S. ----,
 
 138 S. Ct. 2573
 
 ,
 
 201 L.Ed.2d 292
 
 (2018).
 

 Deciding whether a preliminary injunction should issue involves a "flexible" consideration of the four factors identified in
 
 Dataphase Systems, Inc. v. C L Systems, Inc.
 
 ,
 
 640 F.2d 109
 
 (8th Cir. 1981) : (1) the threat of irreparable harm to the movant; (2) balancing this harm with any injury that an injunction would inflict on other
 interested parties; (3) the probability that the movant will succeed on the merits; and (4) the effect on the public interest.
 

 Id.
 

 at 114 ;
 
 Richland
 
 ,
 
 826 F.3d at 1036
 
 . "If the party with the burden of proof makes a threshold showing that it is likely to prevail on the merits, the district court should then proceed to weigh the other
 
 Dataphase
 
 factors."
 
 Planned Parenthood Minn., N.D., S.D. v. Rounds
 
 ,
 
 530 F.3d 724
 
 , 732 (8th Cir. 2008).
 

 A
 

 I begin with the only
 
 Dataphase
 
 factor that the court's opinion addresses: plaintiffs' likelihood of success on the merits of their Fourteenth Amendment claims. Plaintiffs' amended complaint presents two related equal protection claims. The first challenges H.B. 1369's current RSA requirement. The second challenges the elimination of the affidavit fail-safe option, originally accomplished by the enactment of H.B. 1332. In my view, the district court did not clearly err in finding that plaintiffs were likely to succeed on both claims.
 

 It should go without saying-but apparently merits repeating-that the right to vote is both "precious" and "fundamental" to our system of governance.
 
 Harper v. Va. State Bd. of Elections
 
 ,
 
 383 U.S. 663
 
 , 670,
 
 86 S.Ct. 1079
 
 ,
 
 16 L.Ed.2d 169
 
 (1966) ;
 
 Reynolds v. Sims
 
 ,
 
 377 U.S. 533
 
 , 560-62,
 
 84 S.Ct. 1362
 
 ,
 
 12 L.Ed.2d 506
 
 (1964) ;
 
 Wesberry v. Sanders
 
 ,
 
 376 U.S. 1
 
 , 17,
 
 84 S.Ct. 526
 
 ,
 
 11 L.Ed.2d 481
 
 (1964). "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."
 
 Reynolds
 
 ,
 
 377 U.S. at 555
 
 ,
 
 84 S.Ct. 1362
 
 . Because "the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."
 

 Id.
 

 at 562
 
 ,
 
 84 S.Ct. 1362
 
 ;
 
 see also
 

 Yick Wo v. Hopkins
 
 ,
 
 118 U.S. 356
 
 , 370,
 
 6 S.Ct. 1064
 
 ,
 
 30 L.Ed. 220
 
 (1886). If the right to vote is undermined, all "[o]ther rights, even the most basic, are illusory."
 
 Wesberry
 
 ,
 
 376 U.S. at 17
 
 ,
 
 84 S.Ct. 526
 
 .
 

 The Supreme Court has consistently held that the Equal Protection Clause protects the right to vote in several ways, including "the manner of its exercise."
 
 Bush v. Gore
 
 ,
 
 531 U.S. 98
 
 , 104,
 
 121 S.Ct. 525
 
 ,
 
 148 L.Ed.2d 388
 
 (2000). In
 
 Harper
 
 , the Court struck down Virginia's $ 1.50 poll tax as violating the Clause because a voter's ability to pay a poll tax bears no relationship to her voting qualifications.
 
 383 U.S. at 666
 
 ,
 
 86 S.Ct. 1079
 
 . It explained that imposing burdens unrelated to a citizen's voting credentials-including "requirements of wealth or affluence or payment of a fee"-constitutes invidious discrimination in violation of the Fourteenth Amendment.
 

 Id.
 

 at 667
 
 ,
 
 86 S.Ct. 1079
 
 .
 

 The Court reaffirmed
 
 Harper
 
 in
 
 Crawford v. Marion County Election Board
 
 ,
 
 553 U.S. 181
 
 ,
 
 128 S.Ct. 1610
 
 ,
 
 170 L.Ed.2d 574
 
 (2008), a case involving Indiana's photo identification statute. Recognizing
 
 Harper
 
 's holding that "even rational restrictions on the right to vote are invidious if they are unrelated to voter qualifications," Justice Stevens's plurality opinion
 
 [2]
 
 explained how to identify such invidious voting
 laws: by using a balancing test derived from the Court's decisions in
 
 Anderson v. Celebrezze
 
 ,
 
 460 U.S. 780
 
 ,
 
 103 S.Ct. 1564
 
 ,
 
 75 L.Ed.2d 547
 
 (1983), and
 
 Burdick v. Takushi
 
 ,
 
 504 U.S. 428
 
 ,
 
 112 S.Ct. 2059
 
 ,
 
 119 L.Ed.2d 245
 
 (1992).
 
 Crawford
 
 ,
 
 553 U.S. at 189
 
 ,
 
 128 S.Ct. 1610
 
 . Under the
 
 Anderson
 
 -
 
 Burdick
 
 framework, any "burden that a state law imposes on a political party, an individual voter, or a discrete class of voters[,] ... [h]owever slight[,] ... must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.' "
 

 Id.
 

 at 191
 
 ,
 
 128 S.Ct. 1610
 
 (quoting
 
 Norman v. Reed
 
 ,
 
 502 U.S. 279
 
 , 288-89,
 
 112 S.Ct. 698
 
 ,
 
 116 L.Ed.2d 711
 
 (1992) ). Even rational and modest burdens-like Virginia's $ 1.50 poll tax-will fail this balancing test if they are ultimately irrelevant to the voter's qualifications, such as when they make "the affluence of the voter or payment of any fee an electoral standard."
 
 Id.
 
 at 189,
 
 128 S.Ct. 1610
 
 (quoting
 
 Harper
 
 ,
 
 383 U.S. at 666
 
 ,
 
 86 S.Ct. 1079
 
 ).
 

 In
 
 Crawford
 
 , after weighing the state interests against the burdens supported by the record, the Court ultimately concluded that Indiana's photo identification law satisfied the
 
 Anderson
 
 -
 
 Burdick
 
 balancing test.
 
 Id.
 
 at 204,
 
 128 S.Ct. 1610
 
 . At first blush, it may be tempting to conclude that North Dakota's laws operate no differently than the Indiana law upheld in
 
 Crawford
 
 . But a close examination shows that the laws' differences outpace their similarities.
 

 1
 

 The Court in
 
 Crawford
 
 acknowledged that Indiana's law would not survive constitutional scrutiny "if the State required voters to pay a tax or a fee to obtain a new photo identification."
 

 Id.
 

 at 198
 
 ,
 
 128 S.Ct. 1610
 
 . Here, the district court concluded that North Dakota does impose a fee on all state-issued forms of identification. It is undisputed that a driver's license costs, at minimum, fifteen dollars. The Secretary claims that nondriver's identification cards are available for free, but plaintiffs presented contrary evidence that the district court found more credible. At the time of the district court's decision, the North Dakota Department of Transportation's official website plainly indicated that a nondriver's identification card costs eight dollars. Furthermore, one plaintiff testified that she was charged this fee to obtain a card. The district court did not clearly err in finding plaintiffs' evidence more credible.
 
 [3]
 

 See
 

 Anderson
 
 ,
 
 470 U.S. at 574
 
 ,
 
 105 S.Ct. 1504
 
 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Taking the facts as found by the district court, obtaining a state-issued identification card-the only "valid form of identification" that most North Dakota residents could possibly obtain-requires payment of a fee.
 

 In addition to the fee, plaintiffs presented significant evidence that obtaining a qualifying state-issued identification imposes a property requirement. Unless the individual is a minor (in which case voting is not an issue), the Department of Transportation's website indicates that obtaining either a driver's license or nondriver's identification card requires a citizen to present one of five documents, which must
 contain the individual's name and current physical address: (1) a government-issued property tax form; (2) a mortgage, lease, or rental document; (3) a homeowner's or renter's insurance policy; (4) a utility bill; or (5) a non-cellular phone bill.
 
 See
 

 Brakebill III
 
 ,
 
 905 F.3d at 562-63
 
 (Kelly, J., dissenting).
 
 [4]
 
 An individual cannot acquire any of these documents unless they own or rent real property in their own name.
 

 The court's opinion today brushes these concerns aside by insisting that a voter only needs to show where he or she resides. But that is simply not true. To obtain a state-issued identification card, the prospective voter must jump through multiple hoops and acquire specific forms of underlying documentation. An individual cannot do so without paying a fee and maintaining an interest in property. The Indiana law at issue in
 
 Crawford
 
 did not impose such requirements, as Indiana offers free identification cards and does not require proof of an interest in property.
 
 See
 

 Crawford
 
 ,
 
 553 U.S. at
 
 198 & n.17,
 
 128 S.Ct. 1610
 
 . Because conditioning the right to vote on the voter's wealth, the payment of a fee, or an interest in property is unconstitutional no matter what justifications the state proffers,
 
 see
 

 Harper
 
 ,
 
 383 U.S. at 667-68
 
 ,
 
 86 S.Ct. 1079
 
 , plaintiffs are likely to succeed on the merits of their claims.
 

 2
 

 Crawford
 
 separately held that a voter identification law may be unconstitutional if the burden it imposes on "a discrete class of voters" outweighs the state's interests in enacting the law.
 
 553 U.S. at 191
 
 ,
 
 128 S.Ct. 1610
 
 . The Court acknowledged that Indiana's identification requirements may impose a "heavier burden" on certain populations, but it determined that the Indiana law mitigated any such burden by allowing any voter to cast a ballot that would be counted so long as the voter executed a sworn affidavit.
 

 Id.
 

 at 199
 
 ,
 
 128 S.Ct. 1610
 
 . The Court also faulted the plaintiffs in
 
 Crawford
 
 for failing to present "any concrete evidence of the burden imposed on voters who currently lack [qualifying] identification."
 

 Id.
 

 at 201
 
 ,
 
 128 S.Ct. 1610
 
 ;
 
 see also
 

 id.
 

 at 204
 
 ,
 
 128 S.Ct. 1610
 
 (Scalia, J., concurring in the judgment) (describing Justice Stevens's opinion as resting on the ground "that petitioners have not assembled evidence to show that the special burden is severe enough to warrant strict scrutiny").
 

 Here, plaintiffs have presented ample concrete evidence of the burden H.B. 1369 will impose, and the law contains no fail-safe option to mitigate that burden. Plaintiffs presented substantial statistical evidence about the effect that the elimination of the fail-safe option would have for the Native American population in North Dakota. Plaintiffs' unrebutted evidence shows that 19% of Native American eligible voters in North Dakota lack a form of qualifying identification required under H.B. 1369
 due to the current RSA requirement. Roughly half of those individuals also lack sufficient supplemental identification documents to comply with the statute, meaning that at least 2,305 Native Americans simply cannot vote. This amounts to the disenfranchisement of roughly 10% of all voting-age Native Americans in the state.
 
 See
 

 Citizen Voting-Age Population: North Dakota
 
 , U.S. Census Bureau (Nov. 15, 2016), https://www.census.gov/library/visualizations/2016/comm/citizen_voting_age_population/cb16-tps18_nd.html.
 

 Plaintiffs also presented evidence that eliminating the fail-safe option indirectly burdens Native Americans to a greater degree than other citizens. Native Americans disproportionately live in severe poverty, so the costs associated with acquiring a state-issued identification (and the necessary underlying documents) burden them to a greater degree. Compared to other North Dakota residents, Native Americans are less likely to have access to transportation, less likely to have internet access, and more likely to have difficulty taking time off work to travel. Even the physical distance that an individual must travel to obtain state-issued identification is, on average, twice as far for Native Americans than non-Native Americans.
 

 The current RSA requirement also disproportionately burdens Native Americans. The requirement that a voter's identification contain an RSA (instead of, for instance, a mailing address) largely affects those with tribal identifications, as state-issued forms of identification already include the individual's RSA. The district court found that Native American communities often lack RSAs. And among those who lack an acceptable identification due to the current RSA requirement, 48.7% of Native Americans do not possess one of the listed supplemental documents bearing their current RSA, compared to 26.2% of non-Native Americans.
 
 Brakebill II
 
 ,
 
 2018 WL 1612190
 
 , at *3. Thus, the current RSA requirement disenfranchises 2,305 eligible Native American voters.
 

 Id.
 

 The court's opinion today dismisses all of this evidence because 88% of North Dakota voters
 
 do
 
 have a qualifying identification.
 
 Ante
 
 at 678-79. That most voters already possess acceptable identification does not save the statute. A barrier to voting may be unconstitutional even if most voters can overcome it.
 
 See
 

 Harper
 
 ,
 
 383 U.S. at 668
 
 ,
 
 86 S.Ct. 1079
 
 (striking down Virginia's poll tax in toto, regardless of "whether the citizen, otherwise qualified to vote, has $ 1.50 in his pocket or nothing at all, pays the fee or fails to pay it");
 
 see also
 

 City of Los Angeles v. Patel
 
 , --- U.S. ----,
 
 135 S. Ct. 2443
 
 , 2451,
 
 192 L.Ed.2d 435
 
 (2015) ("The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." (quoting
 
 Planned Parenthood of Se. Pa. v. Casey
 
 ,
 
 505 U.S. 833
 
 , 894,
 
 112 S.Ct. 2791
 
 ,
 
 120 L.Ed.2d 674
 
 (1992) )). Those without valid identification-12% of the electorate by the court's estimation-hardly constitutes a "small percentage of voters" who would have no effect on any future election. But more important, as
 
 Crawford
 
 acknowledged, a law that imposes a burden on
 
 any
 
 "discrete class" of voters is unconstitutional if it fails the
 
 Anderson
 
 -
 
 Burdick
 
 balancing test.
 
 553 U.S. at 190-91
 
 ,
 
 128 S.Ct. 1610
 
 . And there can be no dispute that disenfranchising 10% of North Dakota's Native Americans constitutes a material burden on a discrete class of voters.
 

 Weighing the laws' burdens against the justifications put forward by the Secretary, plaintiffs are likely to prevail on their claims. The Secretary argued that the laws further the state's interests in preventing voter fraud and maintaining voter confidence in elections. The district court correctly
 held that these types of interests are legitimate. In
 
 Crawford
 
 , Indiana presented evidence of a distinct risk of voter fraud due to the state's inflated voter rolls.
 
 See
 

 553 U.S. at 192-97
 
 ,
 
 128 S.Ct. 1610
 
 . Indiana's voter identification law directly addressed this risk, outweighing the indeterminate burden on the state's voters. Here, in contrast, North Dakota presented no "evidence to show voter fraud has ever been a problem" in the state,
 
 Brakebill I
 
 ,
 
 2016 WL 7118548
 
 , at *10, making the risk of voter fraud only a "theoretical" concern,
 
 Brakebill II
 
 ,
 
 2018 WL 1612190
 
 , at *6. And North Dakota has offered no evidence to support the inference that H.B. 1369 will measurably reduce the risk of voter fraud. This is insufficient to justify disenfranchising 10% of the state's Native American voters. In my view, the district court correctly concluded that plaintiffs have established a likelihood of success on the merits of their Fourteenth Amendment claims.
 

 B
 

 The remaining
 
 Dataphase
 
 factors-the threat of irreparable harm to plaintiffs, the injury an injunction would inflict on other interested parties, and the effect on the public interest-also weigh in favor of granting preliminary injunctive relief. Imposing an excessive burden on the right to vote irreparably harms voters.
 
 Husted
 
 , 697 F.3d at 436-37 ;
 
 see
 

 Reynolds
 
 ,
 
 377 U.S. at 561-62
 
 ,
 
 84 S.Ct. 1362
 
 . The district court determined that the Secretary's interests in preserving voter confidence and preventing "the theoretical possibility of voter fraud" are outweighed by "the public interest in protecting the most cherished right to vote."
 
 Brakebill II
 
 ,
 
 2018 WL 1612190
 
 , at *6-7. I agree.
 

 On appeal, the Secretary argues that the preliminary injunction issued by the district court "expressly enables" fraudulent voting by someone who resides outside North Dakota but maintains a P.O. Box within the state. But other aspects of the challenged statute not covered by the preliminary injunction expose the remoteness of such a possibility: the nonresident would still need to obtain a tribal- or state-issued identification card, neither of which may be issued to a non-North Dakota resident.
 
 See
 

 Brakebill III
 
 ,
 
 905 F.3d at 564
 
 (Kelly, J., dissenting). This overblown concern does not outweigh the other factors favoring relief. In my view, the district court did not abuse its broad discretion in weighing the
 
 Dataphase
 
 factors and determining that preliminary injunctive relief was warranted.
 

 IV
 

 That brings me to the scope of relief available to plaintiffs. The court criticizes the relief ordered by the district court as overbroad, implying that a statewide injunction is not warranted because any unjustified burden is placed on a "relatively small percentage of eligible voters." I disagree. A statute that imposes an unjustified burden on voting is unconstitutional in all its applications, even if some voters are able to comply with it.
 
 See
 

 Harper
 
 ,
 
 383 U.S. at 668
 
 ,
 
 86 S.Ct. 1079
 
 .
 

 The district court was faced with two problematic provisions of North Dakota law: the current RSA requirement and the elimination of the affidavit option. In a carefully crafted order, the district court enjoined the current RSA requirement only in part, requiring the state to accept identification or supplemental documentation bearing a mailing address instead of an RSA. As for the elimination of the affidavit option, the district court would have been within its discretion to simply re-instate its previous injunction, which had stood through the 2016 election without incident. Indeed, plaintiffs presented evidence suggesting that many Native
 American voters had to utilize the affidavit option in 2016 because of the new identification requirements.
 
 See
 

 Brakebill II
 
 ,
 
 2018 WL 1612190
 
 , at *3 (indicating a 665% increase in the use of the affidavit option between 2012 and 2016 in the three counties with the highest percentage of Native American voters). But the district court attempted to craft a more narrow remedy. In light of H.B. 1369's new provisional ballot system, and in light of the Secretary's concessions that the state would accept a broad range of forms of tribal identification, the district court held the Secretary to his commitment that BIA-issued identification and tribal-issued letters would be accepted as either valid identification or supplemental documentation. It also ordered the Secretary to comply with his obligation under
 
 N.D. Cent. Code § 16.1-01-04
 
 .1(6) to clarify the procedures for voters to get their provisional ballots counted. The district court imposed no substantive limits on, nor a timeframe for, his compliance.
 

 This limited remedy was not an abuse of discretion. "Crafting a preliminary injunction is an exercise of discretion and judgment .... In the course of doing so, a court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case."
 
 Trump v. Int'l Refugee Assistance Project
 
 , --- U.S. ----,
 
 137 S. Ct. 2080
 
 , 2087,
 
 198 L.Ed.2d 643
 
 (2017) (per curiam) (cleaned up). The relief ordered by the district court addresses the most burdensome aspects of the challenged laws while leaving the rest of the provisions intact. Indeed, other than allowing tribal members to vote using a mailing address after showing tribal identification (which proves they are state residents), the injunction does nothing except memorialize the Secretary's litigation positions and statutory obligations. Ordering the Secretary to adhere to the interpretation of the law that he advanced in this very litigation does not constitute an abuse of discretion meriting reversal.
 

 It is especially puzzling that the court today vacates the aspects of the district court's injunction that the Secretary did not even seek to stay prior to the 2018 election. The court's opinion says that it is "unnecessary at this juncture to address" the acceptability of BIA-issued identification cards and tribal letters,
 
 ante
 
 at 679, and asserts that there "might" be no problem with the provisional ballot system,
 
 ante
 
 at 680, but vacates these portions of the preliminary injunction anyway. These aspects of the injunction remained in place during the 2018 election, and there is no indication that the district court's order was unworkable or allowed for voter fraud.
 

 "The abuse-of-discretion standard means 'the court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.' "
 
 Novus Franchising
 
 ,
 
 725 F.3d at 895
 
 (quoting
 
 Kern v. TXO Prod. Corp.
 
 ,
 
 738 F.2d 968
 
 , 970 (8th Cir. 1984) ). The district court here was in a unique position to appreciate H.B. 1369's effect on Native American voters' access to the ballot in light of North Dakota's particular demographic and geographic circumstances; it crafted a limited injunction tailored to address those realities. The district court's form of relief does not fall outside the range of permissible choices available, and therefore I would not disturb the decision.
 

 V
 

 On remand, many options remain available to plaintiffs and to the district court. The district court's preliminary injunction was predicated solely on plaintiffs' equal protection claims and did not address their claims under the Voting Rights Act or the
 North Dakota Constitution. Today's decision does not foreclose plaintiffs from renewing their request for the resurrection of the affidavit fail-safe option as a remedy for their claims not at issue in this appeal. Nor does it prevent the district court from providing that relief. Today's opinion also does not prevent the district court from fashioning a narrower form of relief applicable only to those without qualifying identification.
 

 For the reasons identified above, I respectfully dissent.
 

 The decision in
 
 Crawford
 
 was fractured; Justice Stevens's plurality opinion was joined by only two other Justices, and Justice Scalia concurred in the judgment joined by two other Justices. Justice Stevens's opinion rests on narrower grounds than Justice Scalia's, thus it is the controlling opinion.
 
 Marks v. United States
 
 ,
 
 430 U.S. 188
 
 , 193,
 
 97 S.Ct. 990
 
 ,
 
 51 L.Ed.2d 260
 
 (1977) ;
 
 see also
 

 Obama for Am. v. Husted
 
 ,
 
 697 F.3d 423
 
 , 441 n.7 (6th Cir. 2012) (White, J., concurring in part and dissenting in part) (acknowledging such).
 

 After the district court entered its injunction, the Department of Transportation changed its website to indicate that there is no fee for residents eighteen years old or older seeking to obtain their first nondriver's identification card.
 
 See
 

 Brakebill III
 
 ,
 
 905 F.3d at
 
 562 n.5 (Kelly, J., dissenting). Because this change occurred only after the district court's order issued, it cannot render the district court's factual finding clearly erroneous. And even if the fee collection was "mistaken[ ],"
 
 ante
 
 at 679-80, it still operated so as to require payment of a fee to obtain identification necessary to vote.
 

 The court relies on another document located on the Department of Transportation's website containing a broader list of documents as proof of residential address. However, as I previously explained, nothing on this document indicates that this broader list can be used to obtain a driver's license or nondriver's identification card.
 
 See
 

 Brakebill III
 
 ,
 
 905 F.3d at
 
 563 n.6 (Kelly, J., dissenting). The narrower list of documents is what the state identifies as necessary to obtain either card.
 
 See
 

 Drivers License Requirements
 
 , N.D. Dep't of Transp., https://www.dot.nd.gov/divisions/driverslicense/dlrequirements.htm (last visited July 25, 2019) (directing readers to the narrower list under the subheading "Identification Requirements");
 
 ID Card Requirements
 
 , N.D. Dep't of Transp., https://www.dot.nd.gov/divisions/driverslicense/idrequirements.htm (last visited July 25, 2019) (same).