NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough-northern judicial district
No. 2020-0252


NEW HAMPSHIRE DEMOCRATIC PARTY

v.

SECRETARY OF STATE <u>&</u> <u>a</u>.


LEAGUE OF WOMEN VOTERS OF NEW HAMPSHIRE <u>&</u> <u>a</u>.

v.

SECRETARY OF STATE <u>&</u> <u>a</u>.

Argued: April 28, 2021
Opinion Issued: July 2, 2021


<u>Shaheen & Gordon, P.A.</u>, of Concord (<u>William E. Christie</u> and <u>S. Amy Spencer</u> on the joint brief), for plaintiff New Hampshire Democratic Party.

<u>McLane Middleton, Professional Association</u>, of Manchester (<u>Steven J. Dutton</u> on the joint brief), <u>Twomey Law Office</u>, of Epsom (<u>Paul Twomey</u> on the joint brief), <u>Perkins Coie LLP</u>, of Washington, D.C. (<u>Marc E. Elias</u>, <u>John M. Devaney</u>, <u>Bruce V. Spiva</u>, <u>Amanda R. Callais</u>, and <u>Alexander G. Tischenko</u> on the joint brief, and <u>Ms. Callais</u> orally), and <u>Perkins Coie LLP</u>, of Seattle,

Washington (Stephanie R. Holstein on the joint brief), for plaintiffs League of Women Voters of New Hampshire, Douglas Marino, Garrett Muscatel, Adriana Lopera, Phillip Dragone, Spencer Anderson, and Seysha Mehta.

Gordon J. MacDonald, attorney general (Anthony J. Galdieri, senior assistant attorney general, Daniel E. Will, solicitor general, Anne E. Edwards, associate attorney general, and Samuel R.V. Garland, assistant attorney general on the brief, and Mr. Galdieri orally), for the defendants.

DONOVAN, J.  The defendants, the Secretary of State (Secretary) and the Attorney General (collectively, the State), appeal an order of the Superior Court (Anderson, J.) ruling that Laws 2017, chapter 205, also known as Senate Bill 3 (SB 3), is unconstitutional because it unreasonably burdens the right to vote in violation of Part I, Article 11 of the New Hampshire Constitution and violates the equal protection guarantees of the New Hampshire Constitution.  We affirm the trial court's ruling that SB 3 violates Part I, Article 11 of the State Constitution.  Because we determine that SB 3 must be stricken in its entirety, we need not address the State's assertion that the trial court erred in determining that SB 3 also violates the equal protection guarantees of the State Constitution.

## I. Factual and Procedural Background

### A. SB 3

Enacted in July 2017, SB 3 amends New Hampshire's voter registration laws to impose certain requirements for proving an individual's domicile.  See Laws 2017, ch. 205.  Before SB 3 was enacted, an individual could register to vote without presenting any proof of his or her domicile.  See RSA 654:7, IV (2016) (amended 2017).  Rather, the individual was required to submit a form listing his or her domicile address and sign an affidavit that the information provided was true and accurate.  See id.  That affidavit read:

If this form is used in place of proof of identity, age, citizenship, or domicile, I hereby swear that such information is true and accurate to the best of my knowledge.

This form was executed for purposes of proving (applicant shall circle yes or no and initial each item):

2

Identity                              yes/no _____
                                                 (initials)

Citizenship                         yes/no _____
                                                 (initials)

Age                                    yes/no _____
                                                 (initials)

Domicile                             yes/no _____
                                                 (initials)

Id.

SB 3 changed the voter registration process by: (1) creating a distinction between registrations occurring more than 30 days before an election and those occurring within 30 days of and on election day; and (2) adding a new "Voter Registration Form" (Form B). See Laws 2017, ch. 205. Under SB 3, persons seeking to register to vote more than 30 days before an election must present documentation proving that they are domiciled in the town or ward or they will not be permitted to register. See Laws 2017, 205:1. Persons seeking to register within 30 days of an election or on election day are not required to have documentation with them proving their place of domicile in order to vote; however, they must fill out Form B and elect one of two verification options. See Laws 2017, 205:2. The first option (Option 1) states:

I understand that to make the address I have entered above my domicile for voting I must have an intent to make this the one place from which I participate in democratic self-government and must have acted to carry out that intent.

I understand that if I have documentary evidence of my intent to be domiciled at this address when registering to vote, I must either present it at the time of registration or I must place my initials next to the following paragraph and mail a copy or present the document at the town or city clerk's office within 10 days following the election (30 days in towns where the clerk's office is open fewer than 20 hours weekly).

_____ By placing my initials next to this paragraph, I am acknowledging that I have not presented evidence of actions carrying out my intent to be domiciled at this address, that I understand that I must mail or personally present to the clerk's office evidence of actions carrying out my intent within 10 days following the election (or 30 days in towns where the clerk's office is open fewer than 20 hours weekly), and that [I] have received the

3

document produced by the secretary of state that describes the items that may be used as evidence of a verifiable action that establishes domicile.

Failing to report and provide evidence of a verifiable action will prompt official mail to be sent to your domicile address by the secretary of state to verify the validity of your claim to a voting domicile at this address.

Id. The second option (Option 2) states:

_____ By placing my initials next to this paragraph, I am acknowledging that I am aware of no documentary evidence of actions carrying out my intent to be domiciled at this address, that I will not be mailing or delivering evidence to the clerk's office, and that I understand that officials will be sending mail to the address on this form or taking other actions to verify my domicile at this address.

Id.

Voters who select Option 1 on Form B are provided a separate form titled Verifiable Action of Domicile (VAD). See id. The VAD states, "The following checklist shall be used as a guide for what you may use as evidence and shall be submitted to the town or city clerk along with documentation that you are required to provide." Id. The VAD requires that a person provide evidence that he or she has done at least one of the following: (1) established residency at an institution of learning; (2) "rented or leased an abode, for a period of more than 30 days to include time directly prior to an election day at the address listed on the voter registration form"; (3) purchased an abode at the address listed on the registration form; (4) obtained a New Hampshire motor vehicle registration, driver's license, or identification card; or (5) enrolled a dependent minor child in a publicly funded elementary or secondary school serving the town or ward where the applicant is claiming to be domiciled. Id. One such document must be submitted to the town or city clerk's office in the allotted time period specified on Form B. See id.

In addition, SB 3 creates new categories of conduct subject to the statutory penalties for wrongful voting set forth in RSA 659:34 (Supp. 2020). These include: (1) presenting falsified proof of domicile or verifiable action of domicile; (2) failing to provide follow-up documentation if choosing Option 1 on Form B; and (3) providing false information in a written statement to prove that another is domiciled at a particular address. Laws 2017, 205:13. The penalties include a civil fine of up to $5,000 and criminal liability for a class A misdemeanor. See RSA 659:34, I, II.

4

B. The Plaintiffs' Lawsuit

The plaintiffs[1] sued, contending, among other things, that SB 3 is unconstitutional under the New Hampshire Constitution because it burdens the right to vote in violation of Part I, Article 11. The plaintiffs claimed that "[t]he procedural requirements, associated penalties, and incomprehensibility of SB 3 severely and unreasonably burden[] the fundamental right to vote" and that "[t]here is no governmental interest . . . that justifies requiring New Hampshire voters to endure these burdens."

In September 2017, following a hearing, the Trial Court (Temple, J.) preliminarily enjoined enforcement of the penalties associated with SB 3, finding that the new civil and criminal penalties established by SB 3 imposed severe restrictions on the right to vote. The court observed that under SB 3, "if a same-day voter has the required documents at home, swears he/she will provide them, but the voter then cannot get them to the clerk's office in time for one reason or another," it appears that "such a voter will be subject to a $5,000 fine or even a year in jail simply for failing to return paperwork." According to the trial court, SB 3's penalties "act as a very serious deterrent on the right to vote, and if there is indeed a 'compelling' need for them, the Court has yet to see it."

In October 2018, following a hearing that lasted over a week, the Trial Court (Brown, J.) granted the plaintiffs' motion for a preliminary injunction to enjoin enforcement of SB 3 for the November 2018 midterm elections. In assessing the burdens imposed by SB 3, the trial court found that "[i]n stark contrast to the simplicity of the domicile affidavit successfully used in the 2016 general election, Form B contains hundreds of words spread over six paragraphs" and that the plaintiffs demonstrated that SB 3's forms are "confusing, hard to navigate and comply with, and difficult to complete in a timely manner." Given the "increased complexity and confusion surrounding the new forms," the court found that "the average registration time is expected to increase, resulting in longer lines and delays at polling places." In addition, the court found that "the negative impact of SB3 will be greater for certain groups of people," including young people between the ages of 18-24, highly mobile individuals, people of low socioeconomic status, undecided voters, and the homeless.

The court rejected the State's argument that any burden imposed was justified by the State's interest in preventing and protecting against wrongful voting and/or voter fraud, noting that, "as documented throughout the

---

[1] The plaintiffs in this case are New Hampshire Democratic Party, League of Women Voters of New Hampshire, Douglas Marino, Garrett Muscatel, Adriana Lopera, Phillip Dragone, Spencer Anderson, and Seysha Mehta.

preliminary injunction hearing and as acknowledged by the legislature, voter fraud is not widespread or even remotely commonplace." The court also found, "most importantly, SB3 itself does nothing to actually prevent voter fraud," reasoning that "[b]ecause neither option on Form B requires a registrant to provide proof of domicile prior to voting, anyone intent on casting an ineligible vote can readily do so." Therefore, the court determined, "instead of combating fraud, the law simply imposes additional burdens on legitimate voters."

In response to the State's emergency appeal, we granted its request to stay the preliminary injunction order "until after the conclusion of the election on November 6, 2018." While expressing no opinion on the merits of the plaintiffs' underlying challenge to SB 3, we were persuaded that the timing of the preliminary injunction, just two weeks before the November midterm election, created "both a substantial risk of confusion and disruption of the orderly conduct of the election." However, we kept in force the earlier trial court order enjoining the enforcement of the civil and criminal penalty provisions of SB 3.

Thereafter, the State moved for summary judgment. The State asserted, among other things, that the plaintiffs could not satisfy the requisite test for their claim that SB 3 is facially unconstitutional. Pointing to three hypothetical scenarios purporting to demonstrate constitutional applications of SB 3, the State asserted that the plaintiffs could not prove that no set of circumstances exist under which the challenged statute would be valid. The Trial Court (Anderson, J.) rejected the State's argument, finding that its "position that the 'no set of circumstances' standard cannot be met so long as there is at least one theoretically constitutional application of the challenged statute" was "not an accurate characterization of the law as it has been traditionally applied in New Hampshire."

The trial court also rejected the State's argument that, because the plaintiffs failed to show that SB 3 places any burden on the vast majority of New Hampshire voters, SB 3 could not be deemed facially unconstitutional even assuming it might discourage some voters from attempting to register. The court found the State's argument inconsistent with Guare v. State of New Hampshire, 167 N.H. 658 (2015), reasoning that "[a]t no point did the Court in Guare indicate that the plaintiffs were required to establish that the challenged law placed a substantial burden on the vast majority of voters in the State." Because the State's arguments relied on a "faulty legal premise" and because it "faile[d] to advance any argument regarding the appropriate constitutional test to apply to [the plaintiffs'] claims and how those tests are met," the trial court determined that the State failed to establish, as a matter of law, that the plaintiffs' claim must fail.

6

In December 2019, the Trial Court (<u>Anderson</u>, J.) held a six-day bench trial. As stipulated by the parties, exhibits and testimony admitted during the preliminary injunction hearing were also considered by the court.

In reaching its determination that SB 3 imposes an unreasonable burden on the right to vote, the trial court cited "persuasive and credible" testimony from the plaintiffs' expert witnesses. Dr. Bosley, an expert in plain language and readability, testified that her analyses of Form B and the VAD showed that Form B is written at a readability level equivalent to the <u>Harvard Law Review</u>. She testified that the VAD is written at the level of a first-year graduate student and that both forms would be very difficult for the average adult to read and understand. From this unrebutted testimony, the trial court found that "[t]he language contained on [Form B and the VAD] is needlessly complex, both in length and diction."

Dr. Yang, an expert on "queuing theory," opined that, due to its complexity, SB 3 will increase voter registration lines and registration time for voters. Dr. Herron, an expert in the statistical analysis of election administration, analyzed SB 3 under the theory known as the "calculus of voting," which examines the impact of the costs and benefits of voting on a person's decision to vote. Herron testified that the costs imposed by SB 3 will disproportionately impact certain voters such as college students, highly mobile voters, and the homeless, and that, over time, fewer people would participate in New Hampshire elections as a result of SB 3. The trial court credited his testimony in finding that "[t]he most prominent costs associated with SB 3 are the confusion arising from the language of forms; increased wait times likely to result from the complexity of the forms; and incurring post-election obligations and being exposed to potential penalties if selecting Option 1 [on Form B]."

The court found that confusion generated by Form B and the VAD manifested in different ways during the elections in which SB 3 was partially in effect. For example, evidence included testimony that some registrants initialed both Option 1 and Option 2 on Form B, other registrants left the polling place because they did not think they could vote without providing documentation, some election officials improperly sent voters away from the polls with instructions to bring back documentation, and a number of college students testified that they did not believe they had documentation that satisfied the list on the VAD.

Because the forms were complicated, the trial court found that, in practical terms, "a significant majority of registrants will find themselves subject to the substantial penalties imposed by SB 3." The trial court pointed to evidence that none of the 66 new registrants between January and June of 2018 who selected Option 1 on Form B complied with the law by submitting proof of domicile within the time period required. In addition, "[o]f the 1,104

7

new registrants who selected Option 1 between July and December 2018, only 289 individuals returned proof of domicile, subjecting 815 to potential civil and/or criminal penalties." Further, the court noted that "an individual need not cast a fraudulent vote in order to be subject to the penalties set forth in RSA 659:34, I(h)." The court observed that "[e]ven assuming the new voter is entirely truthful about their domicile and is fully eligible to vote in New Hampshire, they could nevertheless be civilly fined $5,000 and/or face a criminal fine of up to $2,000 and a sentence of up to a year in prison if they knowingly and/or purposely fail to return paperwork."

The trial court found that unrebutted expert testimony, "supported by testimony from a multitude of witnesses and the State's own data, suggests that the complicated and confusing nature of the forms will increase average registration times and result in longer lines at polls," which, "together with navigating the forms and the penalties, may outweigh the benefit of voting for some individuals." The court determined that "there exists strong evidence that SB 3, if fully implemented, will suppress voter turnout."

The trial court concluded that SB 3 "imposes an unreasonable and discriminatory burden on the rights of voters in New Hampshire." Accordingly, citing Guare, the court required the State to "meet its burden under intermediate scrutiny to demonstrate that the law is 'substantially related to an important government objective.'" The trial court concluded that the State failed to prove that SB 3 is substantially related to the important governmental interest, including safeguarding voter confidence in the election system and preventing voter fraud, identified by the State. Because the State failed to meet its burden, the court ruled that SB 3 was facially unconstitutional and, finding that the unconstitutional provisions were integral to the general structure of SB 3, the court invalidated the entire law. This appeal followed.

## II. Analysis

The State raises four arguments on appeal.[2] First, it asserts that the trial court erred in facially invalidating SB 3 and should have ruled instead that "the plaintiffs failed to meet their heavy burden of showing that SB 3 was unconstitutional in every set of circumstances." Second, the State argues that we should overrule Guare because it departs from the balancing test we adopted in Akins v. Secretary of State, 154 N.H. 67 (2006), and because it is "substantively incorrect." Third, the State asserts that because SB 3 does not unconstitutionally burden the right to vote, the trial court erred in determining otherwise. Finally, it argues that, rather than invalidating SB 3, the trial court

---

[2] The State also disputes the trial court's ruling on equal protection but we do not address that issue, as noted at the beginning of this opinion.

should have granted the Secretary the opportunity "to revise the forms to reduce complexity, cure confusion, and add clarification." (Capitalization and bolding omitted.)

Whether or not a statute is constitutional is a question of law, which we review de novo. Akins, 154 N.H. at 70. We presume a statute to be constitutional and will not declare it invalid except upon inescapable grounds. See Guare, 167 N.H. at 661. In other words, we will not hold a statute to be unconstitutional unless a clear and substantial conflict exists between it and the constitution. Bd. of Trustees, N.H. Judicial Ret. Plan v. Sec'y of State, 161 N.H. 49, 53 (2010).

"[V]oting is of the most fundamental significance under our constitutional structure." Illinois Elections Bd. v. Socialist Workers Party, 440 U.S. 173, 184 (1979); see Akins, 154 N.H. at 71 (the right to vote is fundamental). "Other rights, even the most basic, are illusory if the right to vote is undermined." Wesberry v. Sanders, 376 U.S. 1, 17 (1964). The significance of this right is reflected in Part I, Article 11 of the New Hampshire Constitution, which provides in part:

> All elections are to be free, and every inhabitant of the state of 18 years of age and upwards shall have an equal right to vote in any election. Every person shall be considered an inhabitant for the purposes of voting in the town, ward, or unincorporated place where he has his domicile.

N.H. CONST. pt. I, art. 11.

A. Applicable Legal Standard

The State argues that, in finding SB 3 facially invalid, the trial court applied an incorrect legal standard. In support, the State raises two interrelated claims of error. First, the State asserts that the trial court "misapplied the facial-challenge standard," which requires that the plaintiffs "demonstrate that there is no set of circumstances under which the act might be valid." (Quotation and brackets omitted.) Second, the State asserts, "A statute applicable to all voters survives a facial challenge even when it imposes an unjustified burden on some," and, therefore, the plaintiffs failed to prove that SB 3 is invalid "in all or virtually all of its applications."

The plaintiffs counter that we have "never used the 'no set of circumstances' test to evaluate claims of facial invalidity of voting laws." They assert that in Guare, we did not "consider hypotheticals under which the statute could be constitutional" and did not imply that we would "uphold a statute if just one hypothetical would result in a constitutional application." Rather, they argue, the trial court applied the correct standard to their facial

9

challenge by evaluating their claim "under the flexible standard set forth" in Akins, "and reaffirmed in Guare, which requires the court to balance the burdens imposed by the law against the State's proffered justification." (Quotation omitted.)  Further, the plaintiffs assert, the question "is not how much a law burdens voters generally, but rather how it burdens those impacted by it."  (Emphases omitted.)

Given the parties' disagreement over the "no set of circumstances" language, we take this opportunity to clarify its meaning and application to the plaintiffs' facial challenge to SB 3.  The "no set of circumstances" language originated in United States v. Salerno, 481 U.S. 739 (1987).  In addressing a facial challenge to the constitutionality of the Federal Bail Reform Act, the Supreme Court stated:

> A facial challenge . . . is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that the Bail Reform Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an "overbreadth" doctrine outside the limited context of the First Amendment.

Salerno, 481 U.S. at 741, 745; see United States v. Stevens, 559 U.S. 460, 473 (2010) (explaining that a law may be invalidated as overbroad under the First Amendment "if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep" (quotation omitted)), superseded by statute on other grounds as stated in United States v. Richards, 755 F.3d 269, 271 (5th Cir. 2014).

We first cited Salerno in Caterpillar Inc. v. New Hampshire Department of Revenue Administration, 144 N.H. 253 (1999), a facial challenge under the Federal Commerce Clause to New Hampshire's tax treatment of foreign royalty and interest payments.  See Caterpillar Inc., 144 N.H. at 257-58.  We rejected the State's argument that, under Salerno, in order to prevail the plaintiffs "must show that there are no circumstances in which the statute would be valid."  Id. at 258.  Declining to apply the "no circumstances" language, we reasoned that "[e]ven if Salerno correctly stated a test for facial challenges," the fact that the Supreme Court did not subsequently apply it to a facial challenge to Iowa's tax statute "put[] into doubt its applicability in this area of law."  Id.

We have subsequently cited Salerno's "no set of circumstances" language to distinguish facial challenges raised outside of the context of the First Amendment.  See, e.g., State v. Hollenbeck, 164 N.H. 154, 158, 163-64 (2012) (citing Salerno and the "no set of circumstances" language as applying to a facial challenge outside the context of the First Amendment and determining

10

that the defendant failed under the applicable standard to prove that the statute was not rationally related to a legitimate governmental purpose "in all circumstances"); Boulders at Strafford v. Town of Strafford, 153 N.H. 633, 642 (2006).

More recently, we have looked to the "no set of circumstances" language when addressing the scope of a party's challenge; that is, whether a party is making a facial or an as-applied challenge to the constitutionality of a statute. See State v. Lilley, 171 N.H. 766, 772 (2019) (explaining that when the defendants did not concede that the relevant portion of the ordinance was constitutional in any circumstance, we construed their challenge to be a facial challenge). The State cites no case in which we have applied the "no set of circumstances" language as requiring a party raising a facial challenge to affirmatively demonstrate the constitutional invalidity of every application of the statute in order to prevail.

In addressing a facial challenge under the Federal Constitution to New Hampshire's signature-match requirement for absentee ballots, the United States District Court for the District of New Hampshire clarified the proper analysis to apply. Saucedo v. Gardner, 335 F. Supp. 3d 202, 205, 213 (D.N.H. 2018). At the outset, the court noted that the United States Supreme Court "has articulated two formulations of the standard for assessing facial challenges to statutes": (1) "a facial challenge can only succeed where the plaintiff establishes that no set of circumstances exists under which the Act would be valid"; and (2) "a plaintiff bringing a facial challenge must establish that it lacks any 'plainly legitimate sweep.'" Id. at 213 (quotations omitted). The district court expressed its concern, however, that those standards "may obscure the relevant inquiry, . . . as they could be taken to suggest that a court's task is to conjure up hypothetical situations in which application of the statute might be valid." Id. (quotations omitted).

Reasoning that because the Supreme Court "has often considered facial challenges simply by applying the relevant constitutional test to the challenged statute, without trying to dream up whether or not there exists some hypothetical situation in which application of the statute might be valid," the district court determined that, "in practice, a facial challenge is best understood as a challenge to the terms of the statute, not hypothetical applications, and is resolved simply by applying the relevant constitutional test to the challenged statute." Id. at 214 (quotations and brackets omitted). In other words, rather than setting forth a test for facial challenges, the "no set of circumstances" language "describ[es] the result of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard." United States v. Supreme Court of New Mexico, 839 F.3d 888, 917 (10th Cir. 2016) (quotation and emphasis omitted). "[W]here a statute fails the relevant constitutional test, it can no longer be constitutionally applied to anyone—and thus there is 'no set of circumstances' in which the statute would be valid." Id.

11

(quotation omitted); see Boulders at Strafford, 153 N.H. at 642 (explaining that "legislation may not be applied in a particular case if it is facially invalid and could not constitutionally be applied in any case").

This interpretation is consistent with our decision in Guare. In Guare, we cited the "no set of circumstances" language and then applied the relevant constitutional test to the plaintiffs' facial challenge under Part I, Article 11. Guare, 167 N.H. at 661-62, 667-68. In doing so, we concluded that because the language in the statute unreasonably burdened the right to vote and because the State failed to advance a sufficiently weighty interest to justify it, the statute violated the State Constitution. Id. at 669. Thus, we resolved the plaintiffs' facial challenge "simply by applying the relevant constitutional test to the challenged statute." Saucedo, 335 F. Supp. 3d at 213 (quotation omitted).

Based upon the discussion above, we are persuaded that the "no set of circumstances" language is not intended to be a test that prescribes a specific method of determining constitutional validity, but, rather, is intended to describe the result of a facial challenge analyzed under the applicable constitutional standard. In the case before us, the trial court correctly determined that the constitutional test applicable to the plaintiffs' facial challenge to SB 3 is the test set forth in Guare. See Boulders at Strafford, 153 N.H. at 636 (explaining that the first question is whether the trial court applied the correct standard in reviewing the constitutionality of the law being challenged). Accordingly, we reject the State's argument that the trial court "misapplied the facial-challenge standard" and should have ruled instead that "the plaintiffs failed to meet their heavy burden of showing that SB3 was unconstitutional in every set of circumstances."

We also reject the State's related argument that SB 3 cannot be facially unconstitutional because only some, but not all, voters are burdened by its requirements and "a purported burden on some voters is insufficient to invalidate a law of general applicability." The State contends that "[t]his principle is reflected in" Crawford v. Marion County Election Board, 553 U.S. 181 (2008) (plurality opinion). However, we are not persuaded that Crawford supports the State's position that a "statute applicable to all voters survives a facial challenge even when it imposes an unjustified burden on some." Rather, the Crawford Court held that "on the basis of the evidence in the record" it was not possible for the Court "to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed that is fully justified." Crawford, 553 U.S. at 200; id. at 202 ("In sum, on the basis of the record that had been made in this litigation, we cannot conclude that the statute imposes 'excessively burdensome requirements' on any class of voters."). Accordingly, the Court weighed the evidence of the law's limited burden on voters generally, and found that the "precise interests advanced by the State" were sufficient to defeat the plaintiffs' facial challenge. Id. at 202 (quotations omitted).

12

B. Guare v. State of New Hampshire

Alternatively, the State asserts that Guare should be overruled. "The doctrine of stare decisis demands respect in a society governed by the rule of law, for when governing legal standards are open to revision in every case, deciding cases becomes a mere exercise of judicial will with arbitrary and unpredictable results." Rallis v. Demoulas Super Markets, 159 N.H. 95, 102 (2009) (quotation omitted). "Thus, when asked to reconsider a previous holding, the question is not whether we would decide the issue differently de novo, but whether the ruling has come to be seen so clearly as error that its enforcement was for that very reason doomed." Id. (quotation omitted). Several factors inform our judgment, including whether: (1) the rule has proven to be intolerable simply by defying practical workability; (2) the rule is subject to a kind of reliance that would lend a special hardship to the consequence of overruling; (3) related principles of law have so far developed as to have left the old rule no more than a remnant of an abandoned doctrine; and (4) the facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification. See id. at 102-03.

The State does not specifically address these stare decisis factors. Rather, the State's lament is that Guare does not strictly apply the framework applicable to constitutional challenges of voting regulations employed under federal law and that we should, accordingly, "set Guare aside and realign [our] voting jurisprudence with federal law." But see State v. Ball, 124 N.H. 226, 233 (1983) (explaining that when interpreting the New Hampshire Constitution, we have never considered ourselves bound to adopt federal interpretations).

Although the State argues that Guare "departs without explanation" from the balancing test we adopted in Akins, in fact we explained at some length in Guare why we adopted a test "similar to" intermediate scrutiny when a voting restriction falls between "'severe' on the one hand and 'reasonable' and 'nondiscriminatory' on the other." Guare, 167 N.H. at 665-66. First, we noted that "[c]ourts in other jurisdictions have recognized that a test similar to intermediate scrutiny applies to a voting restriction that falls between the two extremes" of rational basis and strict scrutiny. Id. at 666. Next, citing Crawford, we observed that the Supreme Court "appears to be divided regarding the issue of whether intermediate scrutiny is available in voting rights cases." Id. at 667. Nonetheless, we determined that both the plurality opinion and the dissenting opinion in Crawford embraced "a test comparable to intermediate scrutiny" and that we, likewise, "believe that the flexible standard that we adopted in Akins includes a test that is similar to intermediate scrutiny." Id.[3]; see Cmty. Res. for Justice v. City of Manchester, 154 N.H. 748,

---

[3] As Justice Stevens observed in Crawford, in neither Norman v. Reed, 502 U.S. 279 (1992), nor Burdick v. Takushi, 504 U.S. 428 (1992), did the Supreme Court identify any litmus test for

762 (2007) (in the context of an equal protection claim, our intermediate level of review required that the government demonstrate "that the challenged legislation be substantially related to an important governmental objective").

The State also asserts that <u>Guare</u> should be overruled because it is "substantively incorrect" in that it "rests on the flawed premise that the statutory definition of domicile in RSA 654:1, I (2016) differed from the statutory definition of 'residence' and 'resident' under" RSA 21:6 (2012) (amended 2018) and RSA 21:6-a (2012) (amended 2018). However, as the State acknowledges, in <u>Guare,</u> it conceded that those statutory definitions were legally different. <u>See</u> <u>Guare</u>, 167 N.H. at 663. Therefore, for purposes of deciding that case, we accepted the State's concession in reaching our decision. <u>See id</u>. Nonetheless, the State now asserts that its concession was incorrect and that our subsequent decision in <u>Casey v. New Hampshire Secretary of State</u>, 173 N.H. 266 (2020), "confirms that the legal assumption on which <u>Guare</u> rested was wrong." The short answer to the State's argument is that, as explained in <u>Casey</u>, the statutes at issue in <u>Guare</u> were subsequently amended. <u>Casey</u>, 173 N.H. at 270 (explaining that the definitions of "resident" and "residence" in RSA 21:6 and :6-a were amended in 2018 to remove from each the phrase "for the indefinite future"); <u>see</u> <u>Opinion of the Justices (Definition of Resident and Residence)</u>, 171 N.H. 128, 137-40 (2018) (discussing in detail the 2018 amendments to RSA 21:6 and :6-a). Accordingly, our post-<u>Guare</u> decisions simply reflect our interpretation of the legislature's amendments to these voting statutes. <u>See</u> <u>Petition of Malisos</u>, 166 N.H. 726, 729 (2014) (explaining that we interpret statutes as written). Under these circumstances, we are not persuaded that <u>Guare</u> should be overruled.

### C. Unreasonable Burden

We next address the State's argument that the trial court erred in finding that SB 3 imposes an unreasonable burden on the right to vote. Specifically, the State asserts that the court erred because: (1) Form B and the VAD are not confusing or misleading; (2) the court's reliance upon "anecdotes and non-specific hearsay statements" in concluding that SB 3 caused voter confusion during the 2018 general election was insufficient to support its conclusion; (3) there was "no reasonable basis" for the trial court to conclude that any of the individuals who registered in 2018 using Option 1 would find themselves subject to SB 3's penalties; and (4) the court's conclusion that the complicated and confusing nature of the forms will result in longer same-day registration lines was "insufficient to invalidate SB3 on its face."

---

measuring the severity of a burden that a state law imposes on a voter. Instead, "[h]owever slight that burden may appear, . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" <u>Crawford v. Marion County Election Board</u>, 553 U.S. 181, 191 (2008) (quoting <u>Norman</u>, 502 U.S. at 288-89).

14

The State's arguments challenge the sufficiency of the evidence supporting the trial court's findings. We review sufficiency of the evidence claims as a matter of law and uphold the findings and rulings of the trial court unless they are lacking in evidentiary support or tainted by error of law. Walker v. Walker, 158 N.H. 602, 608 (2009); see Boyle v. City of Portsmouth, 172 N.H. 781, 789 (2020). We accord considerable weight to the trial court's judgments on the credibility of witnesses and the weight to be given testimony. Walker, 158 N.H. at 608. We view the evidence in the light most favorable to the plaintiffs. Id.

The State's contentions that Form B and the VAD are not confusing or misleading, that the penalties associated with SB 3 impose only a minimal burden on the right to vote, and that same-day registration lines do not elevate the burden beyond minimal, are all based upon its interpretation of the evidence. However, as the plaintiffs correctly observe, "the question on appeal is not whether the court could have interpreted the evidence differently; it is whether there is sufficient evidentiary support for the interpretations and findings the trial court reached." See Blagbrough Family Realty Trust v. A & T Forest Prods., 155 N.H. 29, 36, 38 (2007). Having reviewed the record before us, we determine that it supports the findings made by the trial court.

The State also argues that the trial court's conclusion that SB 3 caused voter confusion during the 2018 general election was "based on anecdotes and non-specific hearsay statements insufficient to support that conclusion." In so arguing, the State does not challenge any of the trial court's rulings admitting specific evidence. Rather, in the context of a sufficiency of the evidence claim, it challenges the manner by which the trial court weighed this anecdotal and hearsay evidence. However, we defer to the trial court's judgment as to the weight to be afforded to evidence. See O'Malley v. Little, 170 N.H. 272, 275 (2017). In addition, as the trial court expressly stated, the anecdotal evidence at trial was "supported by the persuasive and credible expert testimony offered by Plaintiffs, for which the State had no effective rebuttal." See In re Estate of Washburn, 141 N.H. 658, 660 (1997) (explaining that anecdotal evidence and expert testimony supported the trial court's determination that the testatrix's capacity was adversely affected by Alzheimer's).

The State also asserts that its important interests, including "safeguarding voter confidence, protecting public confidence in the integrity of the State's elections, and helping to prevent and protect against voter fraud," justify any burden imposed by SB 3. Relying upon SB 3's legislative history, the State further maintains that SB 3 "seeks a better assessment of the domicile qualification" by making "it more difficult for persons to engage in wrongful voting," and reducing the number of sworn registration affidavits "to a manageable level so they can be efficiently and timely investigated." We acknowledge that the interests identified by the State are important, if not vital.

15

Nonetheless, under our intermediate level of scrutiny, at trial the State was required to prove that the "challenged law [is] substantially related to an important governmental objective." Guare, 167 N.H. at 665.

The trial court reasoned:

Although additional hurdles have been put in place, the fact remains that new voters may register by affidavit without proof of domicile and cast a valid vote. Notably, the ballots filled out by voters registering via affidavit are not provisional; there is no way of distinguishing between ballots once they have been cast. Therefore, any individual intent on casting a fraudulent vote will be able to do so by selecting Option 2 [on Form B], for which there are no additional penalties under SB 3. Even assuming a fraudulent voter faced greater penalties under SB 3, the State presented no evidence that these would be a deterrent to a fraudulent voter.

Consequently, having found that SB 3 does not impede fraudulent voters, the trial court rejected the State's voter-fraud justification, and, likewise, found that the State's perceived need to protect the integrity of New Hampshire's elections was "illusory."

The trial court similarly rejected the State's assertion that SB 3 serves the important governmental interest of reducing the administrative cost of post-election investigations. Relying upon the testimony of a New Hampshire Department of Justice (DOJ) investigator, the trial court found that, prior to the enactment of SB 3, the "vast majority" of domicile addresses submitted by affidavits "were verified [by] using the internet and phone calls." By contrast, as the trial court observed, a fully implemented SB 3 regime would require that the DOJ investigate each of the 815 voters who selected Option 1 and failed to return documentation following the 2018 election, as opposed to simply verifying their addresses. Otherwise, SB 3's penalty provision would be rendered "either entirely meaningless or would result in completely arbitrary enforcement." As a result, the trial court concluded that any enforcement of SB 3 would require "significant costs that, at a minimum, would match the cost of the verification system pre-SB 3."

We are persuaded by the trial court's analysis and determine that its findings are supported by the record before us. Accordingly, we conclude that SB 3 is unconstitutional, as the State has failed to demonstrate that SB 3 is substantially related to the precise governmental interests it set forth as justifications necessitating the burdens the law imposes on the right to vote. See Guare, 167 N.H. at 667; Anderson, 450 U.S. at 789.

16

D. <u>Voter Registration Forms</u>

Finally, the State argues that the trial court erred by not allowing the Secretary to revise Form B and the VAD to "reduce complexity, cure confusion, and add clarification." The trial court determined that, because the language contained in the forms was mandated by the legislature and the Secretary's statutory authority is limited to modifying the physical layout of the forms, the Secretary may not alter the language in an effort to cure SB 3. The State asserts that this interpretation of the Secretary's statutory authority is incorrect.

RSA 654:7, IV(c) provides that "[t]he secretary of state shall prescribe the form of the voter registration form to be used only for voter registrations . . . starting 30 days before each election and at the polling place on election day, which shall be in substantially the following form . . . ." RSA 654:7, IV(c) (Supp. 2020). RSA 654:7, V provides:

> The secretary of state shall prepare and distribute an addendum to the voter registration form used under subparagraph IV(c) to be distributed to those registrants who register within 30 days before the election or on election day and who do not provide proof of domicile or a verifiable action to demonstrate domicile. The "verifiable action of domicile" document shall provide notice of the requirements that registrants must furnish documentary evidence of domicile and shall be in substantially the following form . . . .

RSA 654:7, V (Supp. 2020). The State asserts that the phrase "in substantially the following form" in these statutes authorizes the Secretary to alter the language of the forms so that "[l]ong sentences can be broken into shorter sentences; passive voice expressions changed to active voice expressions to reduce words; redundant words or phrases can be eliminated or simplified; indentation and other formatting can be used to more clearly convey how the form works." Such revisions, the State asserts, would be consistent with decisions of other courts interpreting similar statutory language.

However, the one relevant case relied upon by the State does not support its broad interpretation of the Secretary's authority to modify statutory language. See People ex rel. Davis v. Chicago, B. & Q. R. Co., 268 N.E.2d 411 (Ill. 1971). In that case, the issue was whether a ballot providing spaces for votes "for" and "against" substantially complied with the statutory form providing voting spaces designated by the words "Yes" and "No." Id. at 413-14 (quotations omitted). In resolving that issue, the court contrasted statutes that require exact expressions in the statutory form with those requiring the ballot to "be substantially in the following form." Id. at 415 (quotation omitted). The court reasoned that under the former, substituting the words "Yes" and "No" on

17

the ballot form with different words would be prohibited, but under the latter it was not prohibited because the substituted terms "for" and "against" were "substantially" in the form of "Yes" and "No." Id. at 413-15 (quotations omitted). This interpretation of the word "substantial" in the context of a ballot form does not support the State's position in the case before us. Although the administrative act of substituting two discrete terms with synonymous words may constitute substantial compliance with statutory form, we cannot conclude that such a legislative directive authorized the Secretary to make substantive revisions necessary to "reduce complexity, cure confusion, and add clarification" to Form B and the VAD or "to cure the types of form issues that caused the trial court and the plaintiffs concern."[4] See Priorities USA v. State, 591 S.W.3d 448, 455-56 (Mo. 2020) (determining that the secretary of state has no authority to alter the terms of a voter registration statute to correct language found to be unconstitutional).

In addition, the State suggests that "the doctrine of severability may further reduce the burden" imposed by SB 3, "without striking SB 3 in its entirety." "In determining whether the valid provisions of a statute are severable from the invalid ones, we are to presume that the legislature intended that the invalid part shall not produce entire invalidity if the valid part may be reasonably saved." Associated Press v. State, 153 N.H. 120, 141 (2005) (quotation omitted). "We must also determine, however, whether the unconstitutional provisions of the statute are so integral and essential in the general structure of the act that they may not be rejected without the result of an entire collapse and destruction of the statute." Id. (quotation omitted).

We agree with the trial court that "Form B and the VAD are the centerpieces of SB 3, without which much, if not all, of the legislation ceases to make sense." As the court explained, "The penalties enacted rely on words defined in or actions take[n] pursuant to forms that no longer exist, and the two-tiered registration system no longer functions, as there is no longer an affidavit to submit within thirty days of an election and on election day." Given that Form B and the VAD are "integral and essential in the general structure of" SB 3, the law must be stricken in its entirety. Id. (quotation omitted).

### III. Conclusion

We conclude that SB 3 imposes unreasonable burdens on the right to vote. We also conclude that the State failed to carry its burden to demonstrate

---

[4] Indeed, although we are not bound by the opinion of the Deputy Secretary of State, at trial, he testified that the statute sets forth the specific language in the voter registration forms, and the Secretary of State's involvement is limited to formatting the physical layout "to make sure it fits on the page."

that SB 3 is substantially related to an important governmental objective. Accordingly, we affirm the trial court's determination that SB 3 violates Part I, Article 11 of the State Constitution.

Affirmed.

HICKS, BASSETT, and HANTZ MARCONI, JJ., concurred.